IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | | |
|---|---|---|
| GREGORY VILLAFRANCO, | ) | |
| | ) | Civil No. 2:05-CV-368BSJ |
| Movant, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **& ORDER** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| ———————————————— | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Crim. No. 2:03-CR-901BSJ |
| | ) | |
| vs. | ) | |
| | ) | |
| GREGORY VILLAFRANCO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

```
┌─────────────────────────────────┐
│              FILED               │
│   CLERK, U.S. DISTRICT COURT     │
│     April 17, 2006 (4:28pm)      │
│        DISTRICT OF UTAH          │
└─────────────────────────────────┘
```

* * * * * * * * *

On May 10, 2005, petitioner Gregory Villafranco filed a "Petition for a Writ of Audita

Querela" under the All Writs Act, 28 U.S.C. § 1651(a) (2000),[1] claiming that his sentence is now

infirm due to the Supreme Court's ruling in *United States v. Booker (United States v. Fanfan)*,

543 U.S. 220 (2005).

---

[1] Section 1651(a) reads:

> (a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

## I.      PROCEDURAL HISTORY

On November 19, 2003, a federal grand jury returned a one-count Indictment against Gregory Villafranco, charging him with violating 18 U.S.C. § 922(g)(1),[2] to which Villafranco entered a plea of guilty on February 23, 2004.[3]  On May 3, 2004, Villafranco was sentenced to serve a term of forty-eight (48) months' imprisonment, followed by thirty-six (36) months of supervised release.[4]

Villafranco did not appeal from his conviction or his sentence.

Villafranco's conviction and sentence became final upon the expiration of the time for filing of an appeal, *viz.*, on June 4, 2004.[5]

As detailed elsewhere, Villafranco previously filed two post-judgment motions concerning his sentence on August 11, 2004 and March 23, 2005; the first one was denied and

---

[2]Count I alleged that "[o]n or about October 10, 2003, in the Central Division of the District of Utah,"

GREGORY VILLAFRANCO,
aka Greg Franco,

the defendant herein, having been convicted of a crime punishable by imprisonment for more than one (1) year, did knowingly possess in and affecting interstate commerce, a firearm and ammunition, to wit: a Hi-Point 9mm handgun and a handgun magazine containing three rounds of 9mm ammunition; all in violation of 18 U.S.C. § 922(g)(1).

[3](*See* Minute Entry, dated February 23, 2004 (dkt. no. 9) & Statement by Defendant in Advance of Plea of Guilty, filed February 23, 2004 (dkt. no. 10), in *United States vs. Gregory Villafranco*, Case No. 2:03-CR-901BSJ (D. Utah).)

[4](*See* Minute Entry, dated May 3, 2004 (dkt. no. 12), & Judgment in a Criminal Case, filed May 20, 2004 (dkt. no. 14), in  *United States vs. Gregory Villafranco*, Case No. 2:03-CR-901BSJ (D. Utah).)

[5]*See Kapral v. United States*, 166 F.3d 565, 577 (3d Cir. 1999) ("If a defendant does not pursue a timely direct appeal to the court of appeals, his or her conviction and sentence become final . . . on the date on which the time for filing such an appeal expired."); *United States v. Johnson*, 159 Fed. Appx. 835, 837, 2005 WL 3418654, *1 (10th Cir. 2005) (stating that where a defendant did not appeal, "his conviction became final . . . ten business days after the date of entry of judgment"); Fed. R. App. P. 4(b)(1)(A) ( "In a criminal case, a defendant's notice of appeal must be filed in the district court within 10 days after the later of: (i) entry of either the judgment or the order being appealed; or (ii) the filing of the government's notice of appeal."); Fed. R. App. P. 4(b)(6) ("A judgment or order is entered . . . when it is entered on the criminal docket."); Fed. R. App. P. 26(a)(2) ("Exclude intermediate Saturdays, Sundays, and legal holidays when the period is less than 11 days, unless stated in calendar days.").

the second remains pending.[6]

## II.      THE WRIT OF *AUDITA QUERELA*

### A.  The Writ of *Audita Querela* at Common Law

The common-law writ of *audita querela* is a remedy granted in favor of one against whom execution has issued or is about to issue on a judgment the enforcement of which would be contrary to justice, either because of matters arising subsequent to its rendition, or because of prior existing defenses that were not available to the judgment debtor in the original action because of the judgment creditor's fraudulent conduct or through circumstances over which the judgment debtor had no control.

7 Am. Jur. 2d *Audita Querela* § 1, at 432 (1997).  Rooted in Law Latin, the phrase *audita querela*

refers to "'the complaint [or quarrel] having been heard.'"  *Black's Law Dictionary* 126 (8th ed.

Bryan A. Garner, ed. 2004).

The writ was introduced during the reign of Edward III (1327-1377), and was "issued as a

remedy to [a] defendant where an important matter concerning his case had arisen since the

judgment.  Its issue was based on equitable, rather than common law principles."  *Id.* (quoting

L.B. Curzon, *English Legal History* 103 (2d ed. 1979)).  The writ "issued out of Chancery and

was directed to the judges of the King's Bench or Common Pleas, ordering them to do speedy

justice to the debtor, after having heard his complaint (*audita querela*) and the reasons of the

parties."  Theodore F.T. Plucknett, *A Concise History of the Common Law* 394 (5th ed. 1956); 1

William S. Holdsworth, *A History of English Law* 224 (3d ed. 1922).  The writ "was used as a

general remedy for those who had been the victims of forgery or fraudulent manipulation of any

type of procedure and records," and "allow[ed] the debtor to plead common law defences,

---

[6](*See* Memorandum Opinion & Order, filed March 22, 2006 (dkt. no. 6), in *Gregory Villafranco v. United States*, Civil No. 2:05-CV-250BSJ (D. Utah).)

although the statutes deliberately deprived him of that opportunity."  Plucknett, *supra*, at 394

(footnote omitted).

     As the court of appeals explains:

> According to its ancient precepts, the writ of audita querela was invented to afford relief in behalf of one against whom execution had been issued or was about to be issued upon a judgment, which it would be contrary to justice to allow to be enforced, because of matters arising subsequent to the rendition thereof.  3 Blackstone 405; Vol. 5 Amer.Juris. p. 491; Bouv. Law Dict., Rawle's Third Rev., p. 288; Humphreys v. Leggett, 9 How. 297, at page 312, 50 U.S. 297, at page 312, 13 L.Ed. 145; Kelley v. Kelley, Mo. App., 290 S.W. 624; Baker v. Penecost, 171 Tenn. 529, 106 S.W.2d 220.  It is a direct action, essentially equitable in nature.  It contemplates a valid defense to the judgment, and the absence of a legal remedy, including the right of appeal.  Robertson v. Commonwealth, 279 Ky. 762, 132 S.W.2d 69, Barnett v. Gitlitz, 290 Ill.App. 212, 8 N.E.2d 517; Vol 4, Words and Phrases, Perm.Ed., p. 817; Vol. 5 Amer.Juris., p. 491.

*Oliver v. City of Shattuck ex rel. Versluis*, 157 F.2d 150, 153 (10th Cir. 1946).  The writ of *audita*

*querela* "served as a means by which judgment debtors could seek relief from a judgment that had

become infirm since its entry by virtue of a discharge or other subsequent matter which for some

reason could not have been raised at trial."  *United States v. Gonzalez*, 152 Fed. Appx. 743, 745-

46, 2005 WL 2767246, at *2 (10th Cir. 2005) (citing *Black's Law Dictionary* 131 (6th ed. 1990));

*see Oakland Heights Mobile Park, Inc. v. Simon*, 40 Conn. App. 30, 32, 668 A.2d 737 (1995)

("Audita querela is a remedy granted in favor of one against whom execution has issued on a

judgment, the enforcement of which would be contrary to justice because of (1) matters arising

subsequent to its rendition, or (2) prior existing defenses that were not available to the judgment

debtor in the original action, or (3) the judgment creditor's fraudulent conduct or circumstances

over which the judgment debtor had no control.").[7]

---

[7]The writ of *audita querela*, says Blackstone, is "a writ of a most remedial nature, and seems to have been

(continued...)

These days, "'a writ of audita querela is used to challenge "a judgment that was correct at the time rendered but which is rendered infirm by matters which arise after its rendition."'" *Gonzalez*, 152 Fed. Appx. at 746 (quoting *United States v. Torres,* 282 F.3d 1241, 1245 n.6 (10th Cir. 2002) (quoting *United States v. Reyes*, 945 F.2d 862, 863 n.1 (5th Cir. 1991))).[8] "'In modern practice, the writ has been supplanted by the more simple and expeditious motion to vacate or . . . for relief against the judgment, based upon equitable grounds,'" *id.* at 746 (quoting *Oliver v. City of Shattuck ex rel. Versluis,* 157 F.2d 150, 153 (10th Cir. 1946)), at least in civil cases, and particularly since a 1946 amendment to Fed. R. Civ. P. 60(b) abolished the writ.[9]

## B.  The Writ of *Audita Querela* Under the All Writs Act

The All Writs Act, 28 U.S.C. § 1651(a), provides that "[t]he Supreme Court and all courts

---

[7](...continued)
invented, lest in any case there should be an oppressive defect of justice, where a party has a good defence, but by the ordinary forms of law had no opportunity to make it."  3 William Blackstone, *Commentaries on the Laws of England* *405 (1768).

[8]*Accord United States v. Holt*, 417 F.3d 1172, 1174 (11th Cir. 2005) (per curiam):

*Audita querela*, Latin for "the complaint having been heard," was an ancient writ used to attack the enforcement of a judgment after it was rendered.  BLACK'S LAW DICTIONARY 126 (7th ed. 1999). The common law writ was typically employed by a judgment debtor in a civil case against the execution of a judgment because of some defense or discharge arising subsequent to the rendition of the judgment or the issue of the execution. *See id.*; *see also Gonzalez v. Sec'y for the Dep't of Corr.*, 366 F.3d 1253, 1289 (11th Cir.  2004) (Tjoflat, J., dissenting).

[9]According to the Advisory Committee Note to the 1946 Amendment to Rule 60(b):

If these various amendments, including principally those to Rule 60(b), accomplish the purpose for which they are intended, the federal rules will deal with the practice in every sort of case in which relief from final judgments is asked, and prescribe the practice.  With reference to the question whether, as the rules now exist, relief by coram nobis, bills of review, and so forth, is permissible, the generally accepted view is that the remedies are still available, although the precise relief obtained in a particular case by use of these ancillary remedies is shrouded in ancient lore and mystery. . . .

Advisory Committee on Rules for Civil Procedure, *Report of Proposed Amendments to Rules of Civil Procedure for the District Courts of the United States*, 5 F.R.D. 433, 479 (1946) (citations omitted).  The 1946 amendment became effective on March 19, 1948.

established by Act of Congress may issue all writs necessary or appropriate in aid of their

respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C.A. §1651(a)

(1994).

While Rule 60(b) of the Federal Rules of Civil Procedure formally abolished the writ of

*audita querela*, the Supreme Court in *United States v. Morgan*, 346 U.S. 502 (1954),

acknowledged the continuing availability of common-law post-conviction remedies under the All

Writs Act.  "*[M]organ* stands for the proposition that the common law writs, such as coram nobis

and audita querela are available to 'fill the interstices of the federal post conviction remedial

framework.'" *United States v. Valdez-Pacheco*, 237 F.3d 1077, 1079 (9th Cir. 2001) (quoting *U.S.

v. Ayala*, 894 F.2d 425, 428 (D.C. Cir. 1990)).[10]  "In other words, the common law writs survive

only to the extent that they fill 'gaps' in the current systems of postconviction relief."  *Id.*

*Morgan* confirmed the continuing availability of the common-law writ of error *coram

nobis* under the All Writs Act, even after the enactment of 28 U.S.C. § 2255.  346 U.S. at 506-

13.[11]

---

[10]As the Eleventh Circuit recently reiterated,

"[t]he teaching of *Morgan* is that federal courts may properly fill the interstices of the federal postconviction remedial framework through remedies available at common law."  *United States v. Ayala*, 894 F.2d 425, 428 (D.C. Cir. 1990); *see United States v. Kimberlin*, 675 F.2d 866, 869 (7th Cir. 1982) (noting that federal courts may recognize common law writs in a criminal context when "necessary to plug a gap in the system of federal postconviction remedies").

*Holt*, 417 F.3d at 1175.

[11]As *Morgan* explained:

The writ of *coram nobis* was available at common law to correct errors of fact.  It was allowed without limitation of time for facts that affect the "validity and regularity" of the judgment, and was used in both civil and criminal cases.  While the occasions for its use were infrequent, no one doubts its availability at common law.  *Coram nobis* has had a continuous although limited use also in our states. . . .

(continued...)

As the court of appeals has explained:

Writs of audita querela and coram nobis "are similar, but not identical." *United States v. Reyes*, 945 F.2d 862, 863 n. 1 (5th Cir. 1991). Usually, a writ of coram nobis is used "to attack a judgment that was infirm [at the time it issued], for reasons that later came to light." *Id*. By contrast, a writ of audita querela is used to challenge "a judgment that was correct at the time rendered but which is rendered infirm by matters which arise after its rendition." *Id*. Rule 60(b) of the Federal Rules of Civil Procedure formally abolished both writs. *United States v. Beggerly*, 524 U.S. 38, 45, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998); Fed. R. Civ. P. 60(b) (both stating that writs of coram nobis and audita querela were abolished by Rule 60(b)). However, the Supreme Court held in *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), that the writ of coram nobis could still be pursued in the criminal contexts under the All Writs Act. At least four of our sister circuits have questioned whether audita querela may also be used "to vacate an otherwise final criminal conviction" under the All Writs Act, but have assumed, "without deciding, that in some set of circumstances audita querela might appropriately afford post-conviction relief to a criminal defendant." *Reyes*, 945 F.2d at 865 (collecting cases).

*United States v. Torres,* 282 F.3d 1241, 1245 n.6 (10th Cir. 2002).

## C. *Audita Querela* and 28 U.S.C §2255

The Tenth Circuit has held that "a writ of *audita querela* is 'not available to a petitioner when other remedies exist, such as a motion to vacate sentence under 28 U.S.C. § 2255.'"[12]

---

[11](...continued)
346 U.S. at 507 (footnotes omitted). *Morgan* held that federal courts have the power to employ *coram nobis* to vacate judgments of conviction in those cases where the errors relied upon as grounds for seeking *coram nobis* relief were errors of the most fundamental character, that is, errors which rendered the proceeding itself invalid and irregular.

[12]28 U.S.C. §2255 reads in part:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C.A. § 2255 ¶ [1] (Supp. 2005). The "essential function" of § 2255 "is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) (citing *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968); *Price v. Johnston*, 334 U.S. 266, 283 (1948)).

*Torres*, 282 F.3d at 1245 (quoting *Tavares v. Massachusetts,* 59 F. Supp. 2d 152, 155 (D. Mass. 1999)); *accord Valdez-Pacheco*, 237 F.3d at 1080 ("[A] federal prisoner may not challenge a conviction or sentence by way of a petition for a writ of audita querela when that challenge is cognizable under § 2255 because, in such a case, there is no 'gap' to fill in the postconviction remedies . . . ."); *Holt*, 417 F.3d at 1175 ("The Fourth, Fifth, Seventh, Ninth, and Tenth Circuits have determined likewise that a federal prisoner may not use the writ of audita querela where postconviction relief is available through § 2255 or coram nobis motions."); *United States v. Banda*, 1 F.3d 354, 356 (5th Cir. 1993) ("The writ of audita querela permits a defendant to obtain relief against a judgment because of some legal defense arising after the judgment. . . . [T]he writ is not available where . . . the defendant may seek redress under § 2255.").  The Eleventh Circuit has reached the same conclusion as well.  *See United States v. Jackson,* 157 Fed. Appx. 252, 253 (11th Cir. 2005) ("The writ of audita querela . . . may not be granted when relief is cognizable under § 2255.").

Villafranco acknowledges this limitation.  (*See* Petition at 6-7 ¶¶ 9-10 (citing *Valdez-Pacheco*, among other cases).)

In the Tenth Circuit's view, § 2255 generally provides the exclusive means for a defendant to test his conviction in the sentencing court.[13]   The § 2255 remedy lies "unless it is shown to be inadequate or ineffective to test the legality of the prisoner's detention."  *Williams v. United States,* 323 F.2d 672, 673 (10th Cir. 1963), *cert. denied,* 377 U.S. 980 (1964); 28 U.S.C.A. § 2255

---

[13]*See, e.g., Caravalho v. Pugh*, 177 F.3d 1177, 1178 (10th Cir. 1999) (stating that unless inadequate or ineffective, § 2255 "is the exclusive remedy for a federal prisoner attacking the legality of his detention"); *Johnson v. Taylor*, 347 F.2d 365, 366 (10th Cir. 1965) ("The exclusive remedy for testing the validity of a judgment and sentence, unless it is inadequate or ineffective, is that provided for in 28 U.S.C. § 2255."); *accord Lorentsen v. Hood*,  223 F.3d 950, 953 (9th Cir. 2000) ("In general, § 2255 provides the exclusive procedural mechanism by which a federal prisoner may test the legality of detention.").

¶ [5] (Supp. 2005).

Courts have stressed that the remedy under § 2255 is "inadequate or ineffective" only in "extremely limited circumstances."  *Caravalho v. Pugh*, 177 F.3d 1177, 1178 (10th Cir. 1999).[14] Such "extremely limited circumstances" do not include procedural limitations imposed by Congress on the filing of § 2255 motions, or the non-retroactive effect of new court decisions in relation to criminal judgments that have already become final.  *See infra* Parts II.D, II.E.

Given the primacy of the § 2255 remedy, the scope of relief available through a writ of *audita querela* must be very narrow indeed.  In *Melton v. United States*, 359 F.3d 855, 856 (7th Cir. 2004), the Seventh Circuit perceived few, if any interstices or "gaps" in federal post-conviction remedies needing to be filled by relief in the nature of a writ of *audita querela*:

> The ancient writ of audita querela, long ago abolished in federal civil proceedings, see Fed.R.Civ.P. 60(b), has no apparent relevance to criminal sentences.  *Black's Law Dictionary* 126 (7th ed. 1999), describes it as a "writ available to a judgment debtor who seeks a rehearing of a matter on grounds of newly discovered evidence or newly existing legal defenses."  Melton is not a judgment debtor, and the territory of new facts and law is occupied for civil matters by Rule 60(b) and for criminal matters by Fed.R.Crim.P. 33 plus § 2255.  See *United States v. Kimberlin,* 675 F.2d 866, 869 (7th Cir. 1982).

---

14      *See, e.g., Spaulding v. Taylor*, 336 F.2d 192, 193 (10th Cir. 1964) (§ 2255 remedy ineffective when the original sentencing court is abolished); *Stirone v. Markley*, 345 F.2d 473, 475 (7th Cir.) (suggesting that § 2255 remedy might be ineffective when the sentencing court refuses to consider the § 2255 petition altogether or when the court delays inordinately consideration of the petition) (dictum), *cert. denied*, 382 U.S. 829,  86 S.Ct. 67, 15 L.Ed.2d 73 (1965); *Cohen v. United States*, 593 F.2d 766, 771 n. 12 (6th Cir. 1979) (noting that § 2255 remedy is ineffective when petitioner is sentenced by three courts, none of which could grant complete relief) (dictum).

*Caravalho v. Pugh*, 177 F.3d at 1178.  Several circuits have held that a prisoner barred from filing a "second or successive" § 2255 motion may invoke § 2255's "inadequate or ineffective" savings clause and seek habeas corpus relief under § 2241 if he can establish his actual innocence of the offense of conviction, though the Tenth Circuit has not yet addressed the question.  *See Winfield v. Ray*, 74 Fed Appx. 850, 851 & n.3 (10th Cir. 2003); *Reyes-Requena v. United States,* 243 F.3d 893, 902 n.20 (5th Cir. 2001) (allowing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 on a showing of "actual innocence" where the gatekeeping language of § 2255 bars retroactive application of a case that does not state a new rule of constitutional law).

Other circuits have expressed a similar skepticism.  *See, e.g.*, *Valdez-Pacheco*, 237 F.3d at 1080 n.4 ("[A]lthough we do not here conclude that there can never be a gap for audita querela to fill, we do point out that . . . § 2255 contains its own 'gap filling' provision, which allows federal prisoners to file, in the proper circumstances, habeas corpus petitions under 28 U.S.C. § 2241 if § 2255 is otherwise inadequate or ineffective." (citing *Lorentsen v. Hood*, 223 F.3d 950, 953 (9th Cir. 2000))); *cf. Banda*, 1 F.3d at 356 ("It is an open question whether the obsolescent writ survives as a post-conviction remedy."); *United States v. Ayala*, 894 F.2d 425, 428-29 (D.C. Cir. 1990) (stating that a federal prisoner could not use *audita querela* to challenge a sentence or conviction after it had been rendered because "the traditional writ of audita querela adds nothing to these two forms of relief," referring to a § 2255 motion or a writ of error *coram nobis*; "the authority of federal courts to use [*audita querela*] as a 'gap filler' under the All Writs Act is open to serious doubt"); *Reyes*, 945 F.2d at 865 ("We have similar doubts, but for present purposes we assume, without deciding, that in some set of circumstances *audita querela* might appropriately afford post-conviction relief to a criminal defendant."); *Holder*, 936 F.2d at 2 (same).[15]

**D.  Procedural Barriers Under § 2255**

That Congress has imposed various procedural limitations on the making of § 2255 motions does not render the remedy under § 2255 "inadequate or ineffective" in cases affected by those limitations.  *See, e.g.*, *Moore v. Reno*, 185 F.3d 1054, 1055 (9th Cir. 1999) (per curiam) (concluding that § 2255 is not inadequate or ineffective merely because a particular prisoner's § 2255 motion is procedurally barred), *cert. denied*, 528 U.S. 1178 (2000).  "A prisoner may not

---

[15]The writ of error *coram nobis* is itself  "extremely circumscribed," *United States v. Hernandez*, 94 F.3d 606, 613 n.5 (10th Cir. 1996), and is "available only to correct errors resulting in a complete miscarriage of justice, or under circumstances compelling such action to achieve justice."  *United States v. Bustillos*, 31 F.3d 931, 934 (10th Cir. 1994).

circumvent valid congressional limitations on collateral attacks by asserting that those very

limitations create a gap in the postconviction remedies that must be filled by the common law

writs. . . ."  *Valdez-Pacheco*, 237 F.3d at 1080 (citations & footnote omitted); *see also Grecco v.*

*Williamson*, 152 Fed. Appx. 195, 196, 2005 WL 2713993, *1 (3d Cir. 2005) ("§ 2255 is not

'inadequate or ineffective' merely . . . because recent amendments to § 2255 have made it more

difficult to pursue successive motions"); *Pack v. Yusuff*, 218 F.3d 448, 452-53 (5th Cir. 2000)

(stating that "section 2255's substantive and procedural barriers by themselves do not establish

that section 2255 is inadequate or ineffective") (citing *Triestman v. United States*, 124 F.3d 361,

376 (2d Cir. 1997)).

For example, "the mere fact" that a petitioner "is precluded from filing a second § 2255

petition[16] does not establish that the remedy in § 2255 is inadequate."  *Caravalho,* 177 F.3d at

1179.  Nor does it mean that the petitioner may obtain an equivalent post-conviction remedy

simply by altering his pleadings to seek a common-law writ such as *audita querela*.  "[T]o allow a

petitioner to avoid the bar against successive § 2255 petitions by simply styling a petition under a

different name would severely erode the procedural restraints imposed under 28 U.S.C. §§

2244(b)(3) and 2255."  *Torres*, 282 F.3d at 1246; *see also In re Davenport*, 147 F.3d 605, 608

(7th Cir. 1998) (even if statutory limitations foreclosed the use of 28 U.S.C. §§ 2241 and 2255 by

federal prisoners, "it would be senseless to suppose that Congress permitted them to pass through

---

[16]Although second or successive applications are restricted under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-32, 110 Stat. 1214, they are not prohibited.  *See* 28 U.S.C.A. §§ 2244(b)(2), 2255 ¶ [8] (Supp. 2005); *Felker v. Turpin*, 518 U.S. 651, 664 (1996) (holding that "[t]he added restrictions which the [AEDPA] places on second habeas petitions . . . do not amount to a 'suspension' of the writ").

At this point, Villafranco does not yet face § 2255's procedural barrier to "second or successive" motions in raising his claims under *Booker* and *Blakely*, and his cover letter accompanying his May 10, 2005 Petition expressly states that "[t]his is not a Motion under 28 U.S.C. § 2255."  (Emphasis in original.)  Nonetheless, the cases discussing second or successive § 2255 motions prove instructive as to when that remedy is "inadequate or ineffective," creating a "gap" to be filled by habeas corpus under § 2241, a writ of error *coram nobis*, or perhaps, a writ of *audita querela*.

the closed door [by way of the All Writs Act] simply by changing the number 2241 to 1651 on

their motions").

> [T]he availability of the § 2255 remedy precludes a prisoner in custody from
> petitioning for a writ of *audita querela* . . . if the prisoner's claim could originally
> have been embraced by § 2255, even if that claim is now barred by successive
> filing restrictions.  Once foreclosed, the writ does not rise like a phoenix to provide
> an additional avenue for redress simply because Congress chose to limit the reach
> of statutory remedies.

*United States v. Apodaca*, 90 Fed. Appx. 300, 303 n.6 (10th Cir. 2004).

### E.  Retroactivity of Decisions and § 2255 "Inadequacy"

A motion may be made under § 2255 to assert a "right [that] has been newly recognized by

the Supreme Court and made retroactively applicable to cases on collateral review."  28 U.S.C.A.

§ 2255 ¶ [8] (3) (Supp. 2005).  But "a new rule is not 'made retroactive to cases on collateral

review' unless the Supreme Court holds it to be retroactive," *Tyler v. Cain*, 533 U.S. 656, 663

(2001), or unless it comes within very narrow exceptions to the standards governing retroactivity

of such rules (*see infra* Part IV.A.2, at n.52).  Where a Supreme Court decision recognizes a new

procedural right, but does *not* make it retroactively applicable to cases on collateral review, a

defendant whose conviction and sentence became final before the decision was announced *cannot*

file a § 2255 motion challenging his conviction or sentence based upon that newly recognized

right.[17]  But that does not render a § 2255 motion "inadequate or ineffective," leaving a "gap" to

---

[17]*See, e.g., United States v. Bellamy*, 411 F.3d 1182, 1188 (10th Cir. 2005).

be filled by a § 2241 writ of habeas corpus,[18] or some other remedy.[19]  *See, e.g.*, *United States ex rel. Perez v. Warden, FMC Rochester*, 286 F.3d 1059, 1061-62 (8th Cir. 2002) ("[W]e believe § 2255 is not inadequate or ineffective simply because a new constitutional doctrine which could reduce a federal prisoner's existing sentence cannot be applied retroactively."); *Love v. Menifee*, 333 F.3d 69, 73-74 (2d Cir. 2003) (same).

### F.  Relief Available Through the Writ of *Audita Querela*

As the Rules Advisory Committee observed some years ago concerning common-law writs such as *audita querela*, "the precise relief obtained in a particular case by use of these ancillary remedies is shrouded in ancient lore and mystery. . . ."[20]  In the half-century since the *Morgan* Court acknowledged a continuing—albeit interstitial—role for writs such as *audita querela* as a federal post-conviction remedy, the precise scope of the writ remained largely undefined.[21]  Also enshrouded in mystery is the nature of the factual or legal showing that must be made to obtain issuance of the writ.

Courts disagree in attempting to define the circumstances that justify issuance of the writ. There are three reported cases in which a federal district court *granted* a writ of *audita*

---

[18]*See, e.g.*, *Williams v. Conner*,  46 Fed. Appx. 918, 919 (10th Cir. 2002) ("Williams's proposed rule would allow prisoners to raise in § 2241 proceedings new rules of constitutional law that have not been explicitly made retroactive by the Supreme Court.  Such a conclusion would run counter to the plain text and structure of § 2255 as well as the intent of Congress to restrict second or successive habeas corpus petitions to extremely limited situations.")

[19]"Circumstances where courts have found or suggested the § 2255  remedy is 'inadequate or  ineffective' include instances where . . . the gate keeping language of § 2255  bars retroactive application of a case that does not state a new rule of constitutional law, *Reyes-Requena v. United States*, 243 F.3d 893, 902 n. 20 (5th Cir. 2001) (allowing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 on a showing of actual innocence)."  *Apodaca*, 90 Fed. Appx. at 303 n.8.  But that is not the circumstance here.

[20]Advisory Committee on Rules for Civil Procedure, *Report of Proposed Amendments to Rules of Civil Procedure for the District Courts of the United States*, 5 F.R.D. 433, 479 (1946) (citations omitted).

[21]As the Seventh Circuit observed in *United States v. Kimberlin*, 675 F.2d 866 (7th Cir. 1982), "Our research has failed to discover any criminal case in which the writ has ever been asked for, let alone issued."  675 F.2d at 869.

-13-

*querela* concerning a federal criminal conviction.  But in these cases, the defendant was a resident

alien and the adverse post-judgment consequence that provided the basis for issuance of the writ

was immigration-related, namely, deportation.  *See United States v. Ghebreziabher*, 701 F. Supp.

115 (E.D.  La.1988); *United States v. Salgado*, 692 F. Supp. 1265 (E.D. Wash.1988); *United*

*States v. Khalaf,* 116 F. Supp. 2d 210, 217 (D. Mass. 1999); *see also Annotation, Availability and*

*Appropriateness of Audita Querela Relief in Connection with Immigration and Naturalization*

*Proceedings*, 105 A.L.R. Fed. 880 (1991 & Supp. 2005).

The *Salgado* court started with the law dictionary definition of *audita querela* as "'an

action brought by a judgment defendant to obtain relief against the consequences of the judgment

on account of some matter of defense or discharge arising since its rendition and which could not

be taken advantage of otherwise.'"  692 F. Supp. at 1269 (quoting *Black's Law Dictionary* 120

(5th ed. 1979)).  The court noted that the petitioner sought relief from the immigration-related

"consequences of the judgment" of conviction, and raised a "matter of defense or discharge

arising since its rendition" in the form of new rights created by congressional immigration

legislation.  *Id.* at 1269-70.  The petitioner needed relief from the consequences of the judgment

of conviction in order to avail himself of the benefit of the those new rights, and under the

"totality of the circumstances" the equities favored such relief.  *Id.  But cf. United States v.*

*Grajeda-Perez*, 727 F. Supp. 1374, 1375 (E.D. Wash. 1989); *United States v. Acholonu*, 717 F.

Supp. 709, 710 (D. Nev. 1989).

The *Ghebreziabher* court granted relief in the nature of audita querela under similar

circumstances in the "interests of justice," based upon the *Salgado* definition of the writ and the

totality of the petitioner's circumstances.  701 F. Supp. at 117 (quoting *Black's Law Dictionary*

-14-

120 (5th ed. 1979)).

The *Khalaf* court granted relief in the nature of both *coram nobis* and *audita querela* where the petitioner established that he was given false information by his counsel concerning the immigration consequences of entering a guilty plea.  Based upon ineffective assistance of counsel—"a legal objection to a criminal conviction" that the petitioner could not raise until after judgment was entered—the district court granted relief setting aside the petitioner's guilty plea. 116 F. Supp. 2d at 214-17.

### 1. *Ayala* **and its Progeny**

According to the Ninth Circuit, the district courts in *Salgado* and *Ghebreziabher* "granted writs of *audita querela* to vacate federal criminal convictions solely on equitable grounds—that is, not based on any error in the conviction—in order to protect defendants from adverse collateral consequences." *United States v. Fonseca-Martinez*, 36 F.3d 62, 64 (9th Cir. 1994).

> However, every court of appeals to consider the question has ruled that, as a matter of law, the writ of *audita querela* is not available to vacate an otherwise valid conviction for solely equitable reasons.  *See United States v. Johnson,* 962 F.2d 579 (7th Cir. 1992); *United States v. Reyes,* 945 F.2d 862 (5th Cir. 1991); *United States v. Holder,* 936 F.2d 1 (1st Cir.1991); *see also United States v. Ayala,* 894 F.2d 425 (D.C. Cir.1990) (strongly indicating that writ not available on solely equitable grounds but ultimately finding it unnecessary to rule on the issue).

*Fonseca-Martinez*, 36 F.3d at 65; *see also Banda*, 1 F.3d at 356 ("In any case, the defense against the judgment must be based in law, not in equity.  *United States v. Reyes*, 945 F.2d 862 (5th Cir. 1991).").  In *Doe v. Immigration and Naturalization Service*, 120 F.3d 200 (9th Cir. 1997), the Ninth Circuit concluded that "a writ of *audita querela,* if it survives at all, is available only if a defendant has a legal defense or discharge to the underlying judgment."  120 F.3d at 204

(footnotes omitted).[22]

Starting with *Ayala*, the appellate case law cited by *Fonseca-Martinez* has construed the "matter of defense or discharge" element of *audita querela* to require a petitioner to raise a legal objection to his judgment of conviction "not cognizable under the existing scheme of federal postconviction remedies." *Ayala*, 894 F.2d at 426.[23] *See, e.g., Doe*, 120 F.3d at 203-04; *United States v. LaPlante*, 57 F.3d 252, 253 (2d Cir. 1995); *United States v. Johnson*, 962 F.2d 579, 582 (7th Cir. 1992) (explaining that *audita querela* "provides relief from the consequences of a conviction when a defense or discharge arises subsequent to entry of the final judgment. The defense or discharge must be a legal defect in the conviction, or in the sentence which taints the conviction."); *United States v. Holder*, 936 F.2d 1, 5 (1st Cir. 1991) (stating that "if available at all, the writ of *audita querela* can only be available where there is a *legal* objection to a conviction, which has arisen subsequent to that conviction, and which is not redressable pursuant to another post-conviction remedy" (citing *United States v. Ayala*, 894 F.2d 425 (D.C. Cir. 1990))); *United States v. LaPlante*, 57 F.3d 252, 253 (2d Cir. 1995) (explaining that "[a]udita querela is probably available where there is a legal, as contrasted with an equitable, objection to a

---

[22]*Oliver* explained that *audita querela* "contemplates a valid defense to the judgment, and the absence of a legal remedy, including the right of appeal," 157 F.2d at 153, but did not confine that "defense" to a legal defect in the underlying proceedings, as *Ayala* and its progeny would seem to require.

For example, a post-judgment payment, settlement or release would not be a legal defect in the proceeding in which a civil judgment was rendered, but would be a "defense" to enforcement of the judgment for purposes of *audita querela*. *See, e.g., Ames v. Sears, Roebuck & Company*, 206 Conn. 16, 20, 536 A.2d 563 (1988) ("The ancient writ of audita querela has been defined as 'a writ issued to afford a remedy to a defendant against whom judgment had been rendered, but who had new matter in defense (e.g., a release) arising, or at least raisable for the first time, after judgment.' A. Leff, 'The Leff Dictionary of Law: A Fragment,' 94 Yale L. J. 1855, 2101 (1985); see also Black's Law Dictionary (5th Ed. 1979) p. 120; 7 J. Moore, Federal Practice (1987) 60.13; E. Stephenson, Connecticut Civil Procedure (1981) 209.").

[23]"Commentators and jurists since the time of Blackstone have emphasized the need to show a postjudgment contingency supplying a 'matter of discharge' or 'defense.'" *Ayala*, 894 F.2d at 429 (citing 3 William Blackstone, *Commentaries on the Laws of England* *405-06) (footnote omitted).

conviction"); *cf. United States v. Reyes,* 945 F.2d 862, 866 (5th Cir. 1991) (discussing "writ of *audita querela* which had traditionally been available only to remedy a legal defect in or defense to the underlying judgment").

Yet this requirement appears to tread upon ground already covered by § 2255, habeas corpus and the writ of error *coram nobis*.  As the D.C. Circuit pointed out in *Ayala*,

> because under modern federal practice, a defendant may, under appropriate circumstances, rely on a postjudgment contingency to attack the lawfulness of his conviction in a section 2255 or a *coram nobis* proceeding, *see, e.g., Davis v. United States*, 417 U.S. 333, 342, 94 S.Ct. 2298, 2303, 41 L.Ed.2d 109 (1974), the traditional writ of *audita querela* adds nothing to these two forms of relief.

894 F.2d at 429 (footnote omitted).  *See also Balsley v. Commonwealth,* 428 S.W.2d 614, 616 (Ky. 1967) ("The technical distinction is that *coram nobis* attacks the judgment itself, whereas *audita querela* may be directed against the enforcement, or further enforcement, of a judgment which when rendered was just and unimpeachable." (quoting *Robertson v. Commonwealth,* 279 Ky. 762, 132 S.W.2d 69, 71 (1939))), *overruled on other grounds*, *Commonwealth v. Hale,* 96 S.W.3d 24 (Ky. 2003).[24]

Further, in at least one case, the Fifth Circuit has suggested that proof of *actual innocence* is required in order to grant relief in the nature of a writ of audita querela.  Concerning the petitioner in that case, the court stated that "he had other procedural vehicles available in which to

---

[24]One commentary asserts that a requirement that there be a legal objection to the original judgment

is incorrect as a historical matter.  At common law, it was not necessary for a defendant seeking audita querela relief to show that he or she had a legal objection to the judgment; in fact, when granted in circumstances in which the matter had arisen after judgment, it was presumed that the judgment was sound at the time it was granted.  Requiring that there be a legal objection to the conviction deviates from the common-law use of the writ and actually seems more akin to situations in which coram nobis relief would be granted.

Ira P. Robbins, *The Revitalization of the Common-Law Civil Writ of Audita Querela as a Postconviction Remedy in Criminal Cases: The Immigration Context and Beyond*, 6 Geo. Immigr. L.J. 643, 682 (Dec.1992) (footnote omitted).

raise his claim," and that "[e]ven assuming that the writ is available to him, [petitioner] is not entitled to relief because he has not demonstrated that he is actually innocent . . . of the offense" upon which his Guidelines "career offender" sentence was based. *Gunn v. United States*, No. 03-50087, slip op. at 2 (5th Cir., decided May 19, 2003) (per curiam) (unpublished disposition)[25] (citing *Kinder v. Purdy*, 222 F.3d 209, 211-13 (5th Cir. 2000)[26] and *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999)[27]).

## 2. *Ejelonu* and the "Essentially Equitable" Nature of the Writ

More recently, the Sixth Circuit has charted a different course in defining the nature of the *audita querela* remedy.  In *Ejelonu v. Immigration and Naturalization Service, Dept. of Homeland Sec.*, 355 F.3d 539 (6th Cir. 2004), the court re-examined the *Ayala* description of *audita querela* with a critical eye, beginning with the Tenth Circuit's description of the writ in *Oliver v. City of Shattuck ex rel. Versluis*:

The Tenth Circuit explained,

> According to its ancient precepts, the writ of *audita querela* was invented to afford relief in behalf of one against whom execution had been issued or was about to be issued upon a judgment, which it would be contrary to justice to allow to be enforced, because of matters arising subsequent to the rendition thereof.

---

[25]Gunn had asserted that he was "actually innocent of the career offender sentence" imposed upon him because "his prior drug conspiracy conviction was improperly used to categorize him as a career offender under U.S.S.G. § 4B1.1."  *Id.*, slip op. at 1.

[26]*Kinder* rejected a similar challenge to a "career offender" sentence through a § 2241 habeas corpus petition: "Because Kinder challenges the manner in which his sentence was initially determined, he must seek post-conviction relief under § 2255," even where such a motion may be barred as a "second or successive" § 2255 motion.  222 F.3d at 212.  Kinder argued that the Guidelines' career offender provisions did not apply to his conviction, but made "no assertion that he is innocent of the crime for which he was convicted."

[27]*Williamson* rejected a similar challenge to a Guidelines "career offender" sentence because "[s]ection 2255 motions may raise only constitutional errors and other injuries that could not have been raised on direct appeal that will result in a miscarriage of justice if left unaddressed. . . .  Misapplications of the Sentencing Guidelines fall into neither category and hence are not cognizable in § 2255 motions."  183 F.3d at 462.

*Oliver v. City of Shattuck ex rel. Versluis,* 157 F.2d 150, 153 (1946) (collecting cases).

\* \* \* \*

  *Ayala* never mentions the definition of *audita querela* provided in *Oliver,* 157 F.2d at 153.  *See Ayala,* 894 F.2d at 425.  The D.C. Circuit cites *Humphreys v. Leggett,* 50 U.S. (9 How.) 297, 314, 13 L.Ed. 145 (1850), for its sweeping conclusion that "because the so-called 'pure equity' variant of *audita querela* finds no support in the historical definition of the writ, the authority of the federal courts to use it as a[n] [equitable] 'gap filler' under the All Writs Act is open to serious doubt."  *Ayala,* 894 F.2d at 429 n. 6.  *Humphreys* is not particularly helpful to *Ayala's* conclusion. According to *Humphreys,* a writ of *audita querela* is:

> 'a writ,' it is said, 'of a most remedial nature, and invented lest in any case there should be an oppressive defect of justice, where a party who has a good defence is too late in making it in the ordinary forms of law';  and *although it is said to be in its nature a bill in equity,* yet, in modern practice, courts of law usually afford the same remedy on motion in a summary way.  The practice in Mississippi seems to prefer a bill in equity for the same purpose.
>
> And courts of equity usually grant a remedy by injunction against a judgment at law, upon the same principles.  In *Truly v. Wanzer,* 5 *Howard* 141, 142, this court say,—'*It may be stated as a general principle with regard to injunctions after a judgment at law, that any fact which proves it to be against conscience to execute such judgment, and of which the party could not have availed himself in a court of law,* or of which he might have availed himself at law, but was prevented by fraud or accident, unmixed with any fault or negligence in himself or his agents, will authorize a court of equity to interfere by injunction to restrain the adverse party from availing himself of such judgment.'  (See also Story, Eq. Jur. § 887.)

  *Humphreys,* 50 U.S. (9 How.) at 313 (emphasis added).

*Ejelonu*, 355 F.3d at 545, 546.  "Thus, according to the Supreme Court," *Ejelonu* continues, *audita querela* may be grounded upon "'any fact which proves it to be against conscience to execute such judgment, and of which the party could not have availed himself in a court of law.' *Id.* (quotation omitted)." *Id.*

  Although the *Humphreys* Court granted relief because the petitioner was

"in the same condition as if the defense had arisen after judgment, which would entitle him to relief by *audita querela*," the *Humphreys* Court never held that a new legal defense against an old judgment provided the *only* basis for *audita querela* relief.  In fact, the Court made clear that a petitioner may receive a writ of *audita querela* when the petitioner can show that some fact that "proves it to be against conscience to execute such [a] judgment," and which the party could not have previously raised. *Humphreys,* 50 U.S. (9 How.) at 313.

*Id.*  Citing to Professor Robbins' critique that "found *Ayala* 'flawed' because '[r]equiring that there be a legal objection to the conviction deviates from the common-law use of the writ,'"[28] the *Ejelonu* court agreed:

We similarly reject the dramatically narrow historical analysis upon which *Ayala* and its progeny depend.  Early scholarly commentary on *audita querela* strongly indicates the writ's equitable nature.  Historian William Holdsworth argued that *audita querela* is of "essentially equitable character."  1 WILLIAM S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 224 (3d ed. 1922).  Holdsworth cited Judge Stonor of King Edward III's reign, who stated, "I tell you plainly that *Audita Querela* is given rather by equity than by common law, for quite recently there was no such suit."  *See* 2 WILLIAM S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 593 (1922).  Significantly, Holdsworth also relied upon Blackstone's Commentaries, which described *audita querela* as "in the nature of a bill in equity, to be relieved against the oppression of the plaintiff."  1 HOLDSWORTH, *supra,* at 224 (citing 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 406 (William D. Lewis ed. 1900)).  According to Holdsworth, the development of audita querela demonstrates that lawyers at the time "were not indifferent to the claims of abstract justice."  2 HOLDSWORTH, *supra,* at 593.  Thus, Holdsworth "argued that *audita querela* was a method used to provide relief when the equities suggested it should be granted."  Robbins, *supra,* at 650.

Early state cases support the Tenth Circuit's position, and what *Ayala* terms the "pure equity" approach to *audita querela* better reflects the writ's common law origins.  As a general matter, these early decisions rely on Blackstone, whom Holdsworth used to conclude that *audita querela* is of "essentially equitable character," 1 Holdsworth, *supra,* at 224. . . .

---

[28]*Id.* (quoting Ira P. Robbins, *The Revitalization of the Common-Law Civil Writ of Audita Querela as a Postconviction Remedy in Criminal Cases:  The Immigration Context and Beyond,* 6 Geo. Immigr. L.J. 643, 681, 682 (Dec.1992)).

*Id.* at 546-47 (footnote & some citations omitted).[29]  In the Sixth Circuit's view,

> As the aforementioned authority establishes, the *Ayala* court was incorrect when it concluded that the "'pure equity' variant of *audita querela* finds no support in the historical definition of the writ." 894 F.2d at 429.  *Ayala* relies on *Humphreys*, but *Humphreys* supports the idea that courts may issue the writ when it "proves to be against conscience to execute [a] judgment."  *Humphreys,* 50 U.S. (9 How.) at 313.  Nothing in *Humphreys* requires courts to find a legal error in the original judgment.  Worse, *Ayala* contends that the "'pure equity' variant of *audita querela* finds no support in the historical definition of the writ," 894 F.2d at 429, without acknowledging the Tenth Circuit's opinion in *Oliver*, which collected a series of relevant cases and held that "*[a]ccording to its ancient precepts*, the writ of *audita querela* was invented to afford relief in behalf of one against whom execution had been issued . . . which it would be contrary to justice to allow to be enforced, because of matters arising subsequent to the rendition thereof."  *Oliver,* 157 F.2d at 153 (emphasis added).

*Id.* at 548 (footnote omitted).[30]  The *Ejelonu* court concluded, "We adopt the conclusions of the Tenth Circuit, Blackstone, the eminent historian Holdsworth, and Professor Robbins, and therefore find that we may mitigate a judgment's collateral consequences through a writ of *audita querela* issued for equitable reasons, regardless of the presence of a legal defect in the original proceeding."  *Id.*

---

[29]Footnote 4 of *Ejelonu* elaborated on this point:

> Ayala also cites Blackstone for the proposition that one requesting a writ of *audita querela* must "show a postjudgment contingency supplying a 'matter of discharge' or 'defense.'" *Ayala,* 894 F.2d at 429 (quoting Blackstone, *supra*, at 405-06).  The law-equity distinction has produced some confusion, partly because some courts have found it inequitable to let the consequences of a legally erroneous judgment remain in force, and partly because some courts have mistakenly read those decisions as *requiring* a legal error in the underlying judgment.  The view *Ayala* articulates would make *audita querela* superfluous because we already have a *remedy at law*—habeas—against a legally erroneous criminal judgment.  As noted, the Supreme Court has rejected the argument that the federal habeas statute, 28 U.S.C. § 2255, abolished common law writs in criminal proceedings.  *Morgan,* 346 U.S. at 511, 74 S.Ct. 247.  *Audita querela* is distinct from habeas or other similar collateral proceedings that require the petitioner to demonstrate legal error, which is why Holdsworth concluded that the development of *audita querela* demonstrates that ancient lawyers "were not indifferent to the claims of abstract justice."  2 Holdsworth, *supra*, at 593.

355 F.3d at 548 n.4.

[30]*Oliver*, like Holdsworth, noted that *audita querela* is "essentially equitable in nature."  157 F.2d at 153.

The *Ejelonu* court read *Salgado* and *Ghebreziabher* as having "granted writs of *audita querela* to mitigate the collateral consequences of an earlier criminal conviction when failing to do so would have produced an unconscionable result," and granted similar relief in favor of petitioner Ejelonu, who had become vulnerable to deportation, because "to deport her under such circumstances would shock the conscience," particularly where "Congress has changed the rules so that juvenile offenders in Petitioner's position no longer face draconian consequences because the INS unreasonably delayed processing a citizenship request." *Id.* at 548-49, 550, 551.  By attempting to deport the petitioner, the government "now (in 2003) seeks to perpetuate a problem Congress acted to eliminate in 2000." *Id.* at 551.[31]  In Ejelonu's case, "equity demands a writ of *audita querela* to avoid a punishment grossly disproportionate to the offense. . . .  *Audita querela* is appropriate because it would be 'contrary to justice,' *Oliver,* 157 F.2d at 153, to allow the collateral consequences of Petitioner's Youthful Trainee status to justify her deportation." *Id.*

### 3.  The Proper Scope of the *Audita Querela* Remedy

Having reviewed the reported case authority referenced in this opinion, including *Oliver*, *Humphreys*, *Ayala*, *Holder*, *Reyes*, *Johnson*, *Banda*, *Fonseca-Martinez*, *Doe*, *Salgado* and *Ghebreziabher*; the scholarly examination of *audita querela* by Professor Robbins and others; and historical sources such as Blackstone's *Commentaries*, this court concludes that the Sixth Circuit's analysis of the *audita querela* remedy comports well with our own court of appeals' understanding of the "essentially equitable" nature of the writ as expressed in *Oliver v. City of Shattuck ex rel. Versluis*.  The view that the writ of *audita querela* "had traditionally been

---

[31]The court also pointed out that Ejelonu's deportation was based upon "illegally obtained evidence," that is, information that had been disclosed in violation of Michigan law; that Ejelonu had been "[i]nadequately informed by her counsel" as to the potential immigration consequences of accepting "Youthful Trainee" status under Michigan law; and that deportation to Nigeria would "condemn Petitioner to a life of penury or worse."

available only to remedy a legal defect in or defense to the underlying judgment," *Reyes*, 945 F.2d at 866 (citing *Ayala*, 894 F.2d at 429), reads the historical sources a little too narrowly, particularly if the scope of *audita querela* is thus to be limited to a collateral attack on the petitioner's conviction and sentence, much akin to § 2255, habeas corpus or *coram nobis*.[32]

---

[32]At the time when the writ of error *coram nobis* was developed in the Sixteenth Century, "a trial court was not authorized to correct its own errors, and a higher court on writ of error could consider only alleged mistakes of law." Wayne R. LaFave & Jerrold H. Israel, *Criminal Procedure* § 28.1, at 1179 (2d ed. 1992). *Coram nobis* was developed "to fill this gap. . . . The writ provided for review by the trial court. Its objective was 'to bring to light errors of fact that the trial court could not have avoided—mistakes that, if known at the time of trial, would have prevented entry of the judgment.' Thus, it allowed presentation of facts not apparent on the face of the record," such as that the "defendant was insane at the time of trial" or that the "defendant had entered a guilty plea out of fear of mob violence." *Id.*; *see generally id.* §§ 28.1-28.3, at 1176-1203; *Morgan*, 346 U.S. at 506-11 (describing history of the writ).

> When holding in *Morgan* that coram nobis may be used to avoid federal criminal convictions, the Supreme Court observed, 346 U.S. at 512-13, 74 S.Ct. at 253, that the writ is valuable to bring an end to what may be substantial civil disabilities attached to criminal convictions. These include loss of the rights to vote, hold occupational licenses (including law licenses), and bear arms; criminal convictions also may lead to enhanced penalties for future offenses. These future effects may call for a fresh look at the conviction. Just as a continuing civil wrong is not beyond redress because its genesis is old, see *Bazemore v. Friday,* 478 U.S. 385, 106 S. Ct. 3000, 3006-07, 92 L. Ed. 2d 315 (1986), so the ongoing effects of a criminal conviction justify the allocation of the judicial resources necessary to take a fresh look. . . .

*United States v. Keane*, 852 F.2d 199, 203 (7th Cir. 1988).

> Although it is settled that the writ of error coram nobis is available under 28 U.S.C.A. § 1651 as a remedy in order to vacate a federal conviction where the sentence imposed following such conviction has been served . . . , nevertheless the courts have held that the writ is so available only where it is necessary to correct errors of such a fundamental character as to render the court proceeding itself invalid, or, as some courts have stated, where circumstances compel such action to achieve justice.

Annotation, *Availability, under 28 U.S.C.A. § 1651, of Writ of Error Coram Nobis to Vacate Federal Conviction Where Sentence Has Been Served*, 38 A.L.R. Fed. 617, 622-23 (1978); *accord Klein v. United States*, 880 F.2d 250, 253 (10th Cir. 1989) ("The writ [of *coram nobis*] 'is available only to "correct errors that result in a complete miscarriage of justice.' *United States v. Williamson*, 806 F.2d 216, 222 (10th Cir. 1986) (quoting *Korematsu v. United States*, 584 F. Supp. 1406, 1419 (N.D. Cal. 1984))."); *United States v. Dellinger*, 657 F.2d 140, 143-44 (7th Cir. 1981) (discussing history and use of *coram nobis*, a writ to be granted "only under circumstances compelling such action to achieve justice").

> The courts have also held that a petition for a writ of error coram nobis to vacate a federal conviction the sentence for which has been served can properly be granted on any of the following grounds, namely: (1) insanity or incompetence of the petitioner at the time of the commission of the offense or at the time of trial . . . ; (2) invalidity of the plea of guilty upon which the petitioner's conviction had been based . . . ; (3) the fact that subsequent to the petitioner's conviction, the United States Supreme Court rendered a decision either (a) holding unconstitutional, as applied to the petitioner, the federal statute under which he had been convicted . . . , or (b) establishing that the petitioner had been

(continued...)

"*[A]udita querela* does not vacate judgments, but the collateral consequences of judgments." *Ejelonu*, 355 F.3d at 552.  Thus, a court "may mitigate a judgment's collateral consequences through a writ of *audita querela* issued for equitable reasons, regardless of the presence of a legal defect in the original proceeding," *Ejelonu*, 355 F.3d at 548.[33]  The writ may issue as to a judgment in a criminal case "which it would be contrary to justice to allow to be enforced, because of matters arising subsequent to the rendition thereof." *Oliver,* 157 F.2d at 153. But the "'matter of defense or discharge arising since its rendition and which could not be taken advantage of otherwise,'" *Holder*, 936 F.2d at 2 (quoting *Black's Law Dictionary* 120 (5th ed. 1979)), is not limited solely to a "legal defect in the conviction, or in the sentence which taints the conviction," *Johnson*, 962 F.2d at 582, that could not have been raised in the original proceeding. Other matters of defense or discharge may be raised as well, *e.g.*, subsequent legislation affecting the collateral consequences of a conviction.

As *Ejelonu* cautioned, the "gap" in federal post-conviction remedies to be filled is a narrow one: "*Audita querela* is an equitable remedy reserved only for the most extreme cases." 355 F.3d at 552.  "*Audita querela* is not a wand which may be waved over an otherwise valid criminal conviction, causing its disappearance; rather, it provides relief from the *consequences* of

---

[32](...continued)

convicted for an act which the applicable federal statute did not make criminal . . . ; (4) unreasonable delay in executing a warrant for the petitioner's arrest . . . ; (5) the fact that the petitioner's conviction was based on false or perjured testimony . . . ; and (6) suppression or withholding by the prosecution of evidence which is vital or material to the petitioner's defense . . . .

38 A.L.R. Fed. at 623-24 (internal citations omitted); *see United States v. Haga*, 931 F.2d 642, 645 (10th Cir. 1991) (affirming denial of *coram nobis* challenge to conviction on grounds that the defendant was mentally ill at the time he entered his guilty plea).

[33]Thus, *audita querela* may sensibly be distinguished from other post-conviction remedies, such as the writ of error *coram nobis*.  As *Elejonu* points out, "*coram nobis* attacks the judgment itself, whereas *audita querela* attacks the consequences of the judgment."  355 F.3d at 544.

a conviction when a defense or discharge arises subsequent to entry of the final judgment,"
*Johnson*, 962 F.2d at 582 (emphasis added), and equitable considerations arising from the totality
of the petitioner's circumstances demand issuance of the writ.

To make his case for issuance of the writ of *audita querela* to relieve him from the
continued enforcement of the judgment in his criminal proceeding, Villafranco must show (1) that
because of a matter of valid defense or discharge arising only after the entry of the judgment in his
criminal proceeding, (2) it would be "unconscionable"—that is, "against conscience" or "contrary
to justice"—"to execute such [a] judgment," (3) for reasons which he could not previously have
raised in his original criminal proceeding, on direct appeal, or otherwise.  *Humphreys,* 50 U.S. (9
How.) at 313; *Oliver*, 157 F.2d at 153.

### III.   *BOOKER*, THE SIXTH AMENDMENT AND THE FEDERAL SENTENCING GUIDELINES

#### A.  *United States v. Booker* **and the Nature of "***Booker* **Error"**

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sixth
Amendment requires that "[a]ny fact (other than a prior conviction) which is necessary to support
a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury
verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt," 543
U.S. at 244; and further, it invalidated the *mandatory* application of the federal Sentencing
Guidelines, no matter whether the facts are admitted by a defendant, proven beyond a reasonable
doubt to a jury, or found by a judge (other than a prior conviction).  *Booker* left the Guidelines in
place—as *guidelines* rather than as a mandatory system of determinate sentencing—by striking
down the requirements of 18 U.S.C. § 3553(b)(1), stating that the court "shall" impose a sentence

within the Guidelines range, and 28 U.S.C. § 3742(e), mandating *de novo* appellate review of sentences for compliance with the Guidelines. *Booker*, 543 U.S. at 245. The Court held that the proper standard of review for criminal sentences is whether the sentence is "unreasonable" under 18 U.S.C. § 3742(e)(3) (1994 ed.). *Id.* at 260-63. *Booker* further instructed that district courts "must consult those Guidelines and take them into account when sentencing." *Id.* at 264.

> Thus, as it now stands, there are two types of "*Booker* error" in criminal sentencing:
>
> First, a court could err by relying upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily. As *Booker* makes clear, the Sixth Amendment prohibits this practice. . . . As a matter of convenience, we will refer to such an error as a "constitutional *Booker* error." Second, a sentencing court could err by applying the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction. . . . While this type of sentence does not violate the Sixth Amendment, . . . such a sentence is nonetheless impermissible because the Court severed the portion of the Sentencing Reform Act that required the mandatory application of the Guidelines. . . .We will refer to this second type of error as a "non-constitutional *Booker* error."

*United States v. Gonzalez-Huerta*, 403 F.3d 727, 731-32 (10th Cir. 2005) (en banc) (citations omitted), *cert. denied*, 126 S. Ct. 495 (2005).[34] A district court may commit both "constitutional *Booker* error" and "non-constitutional *Booker* error" simply by treating the federal Sentencing Guidelines as *mandatory*—which until *Booker* was decided on January 12, 2005, they were. *United States v. Gonzalez-Huerta*, 403 F.3d at 731-32.

_____

[34]As to "constitutional *Booker* error," the court of appeals explains:

> *Booker* made clear that it is the actual sentence, not the sentencing range, that must not be increased based upon judge-found facts in order to violate the Sixth Amendment: "Accordingly, we reaffirm our holding in *Apprendi*: Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

*United States v. Yazzie*, 407 F.3d 1139, 1144 (10th Cir. 2005) (quoting *Booker*, 543 U.S. at 244); *accord United States v. LaVallee*, 439 F.3d 670, 706 (10th Cir. 2006).

At the same time,

> [u]nder *Booker*, "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.". . .  The district courts still maintain the ability to depart downward or upward from the sentencing guideline range, so long as the sentence imposed is reasonable in light of the factors in 18 U.S.C. § 3553(a). . . .

*United States v. Montgomery*, 439 F.3d 1260, 1262 (10th Cir., decided March 10, 2006) (citations omitted).  But an error in Guidelines computation that affects the district court's selection of the sentence imposed is reversible regardless of the "reasonableness" of that sentence under all of the § 3553(a) factors.[35]

---

[35]18 U.S.C. § 3553(a) reads:

>     **(a)  Factors To Be Considered in Imposing a Sentence.**— The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the kinds of sentence and the sentencing range established for—
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>> (i) issued by the Sentencing Commission pursuant to section 994 (a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and
>> (ii) that, except as provided in section 3742 (g), are in effect on the date the defendant is sentenced; or
> (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994 (a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28);

(continued...)

The court of appeals recently held that district courts must accurately calculate a defendant's sentence under the Guidelines, just as they did before *Booker*, *see United States v. Kristl*, 437 F.3d 1050, 1054-55 (10th Cir., decided February 17, 2006), and indicated that it will review the district courts' sentencing calculations just as it did before *Booker*. *Id.* According to the court of appeals, "a sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness." *Id.* at 1054. "This is a deferential standard that either the defendant or the government may rebut by demonstrating that the sentence is unreasonable when viewed against the other factors delineated in § 3553(a)," which include "the nature of the offense and characteristics of the defendant, as well as the need for the sentence to reflect the seriousness of the crime, to provide adequate deterrence, to protect the public, and to provide the defendant with needed training or treatment." *Id.* at 1053, 1054. Conversely, the court of appeals declared that when a district court errs in applying the Guidelines, "we must remand—without reaching the question of reasonableness—unless the error is harmless." *Id.* at 1055.[36] A sentence

---

[35](...continued)

(5) any pertinent policy statement—
(A) issued by the Sentencing Commission pursuant to section 994 (a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and
(B) that, except as provided in section 3742 (g), is in effect on the date the defendant is sentenced[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C.A. § 3553(a) (2000 & Supp. 2005).

[36]*Booker* left intact "18 U.S.C. § 3742(f)(1), which mandates remand when the sentencing court errs in applying the Guidelines and the error affects the selection of the sentence imposed. . . ." *Id.* at 1055 (footnote & citations omitted). It follows that "harmless error" is error which "'did not affect the district court's selection of the sentence imposed.'" *United States v. Labastida-Segura*, 396 F.3d 1140, 1143 (10th Cir. 2005) (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)). The burden of proving the error is harmless is on "the beneficiary of the error." *Chapman v.*

(continued...)

-28-

cannot be considered reasonable "if the manner in which it was determined was unreasonable, *i.e.*, if it was based on an improper determination of the applicable Guidelines range," even though after *Booker* the district court is not obligated to impose a sentence within that range. *Id.*

> Other circuits
>
> now have uniformly agreed that all post-*Booker* sentencing must begin with calculation of the applicable guideline range. As each respective circuit arrived at this conclusion, the district courts in that circuit began to use more uniform procedures to impose sentences. Six circuits—the Fourth, Fifth, Sixth, Seventh, Eighth, and Tenth—now have held that a sentence within the properly calculated guideline range is presumptively reasonable.

United States Sentencing Commission, *Final Report on the Impact of <u>United States v. Booker</u> On Federal Sentencing v* (March 2006); *see id.* at 20-30.

### B. *Booker* and Judicial Fact-Finding as to Sentencing Factors

At first glance, *Booker*—and *Blakely v. Washington,* 542 U.S. 296 (2004) before it—appeared to confine criminal sentencing enhancements to those facts either admitted by the defendant or proven beyond a reasonable doubt to a jury (except a prior criminal conviction). "Despite the straightforward appeal of this approach, however, the Supreme Court did not adopt it in *Booker.*" *Montgomery*, 439 F.3d at 1262.  In *Montgomery*, the district court had resentenced the defendant on charges of possession of firearms and ammunition by a convicted felon to a reduced term of imprisonment in light of *Blakely*, vacating a prior enhancement of the sentence by a two-level upward departure from the Guidelines based on facts not established by a plea of

---

[36](...continued)
*California*, 386 U.S. 18, 24 (1967); *United States v. Lang*, 405 F.3d 1060, 1065 (10th Cir. 2005).

guilty or a jury verdict.[37]  The court of appeals reversed and remanded:

> The district court committed non-constitutional *Booker* error in this case by treating the sentencing guidelines, at least in part, as mandatory.  *United States v. Gonzalez-Huerta,* 403 F.3d 727, 731-32 (10th Cir.), *cert. denied,* --- U.S. ----, 126 S.Ct. 495, 163 L.Ed.2d 375 (2005). . . . The district courts still maintain the ability to depart downward *or upward* from the sentencing guideline range, so long as the sentence imposed is reasonable in light of the factors in 18 U.S.C. § 3553(a).  *Booker,* 125 S.Ct. at 750, 766-67; *United States v. Morales-Chaires,* 430 F.3d 1124, 1128 (10th Cir. 2005); . . .
>
> * * * *
>
> The record clearly indicates the district court would have imposed a higher sentence if it believed it had the discretion to do so. . . .  The initial order granting an upward departure, coupled with the district court's eventual sentence at the top of the guideline range, leads us to conclude the error was not harmless, *i.e.,* the court's non-constitutional *Booker* error did affect its selection of the sentence imposed.

439 F.3d at 1262, 1263 (citations omitted).  The error in *Montgomery* was not in the sentencing court's reliance on its own fact-finding; it was in the sentencing court's treatment of the Guidelines as mandatory.  *See McReynolds v. United States*, 397 F.3d 479, 480 (7th Cir. 2005) (explaining that *Booker* "held that defendants have a right to a jury trial on any disputed factual subject that increases the maximum punishment, and that the federal Sentencing Guidelines come within this rule to the extent that their operation is mandatory.")

Even after *Booker*, "facts relevant to sentencing have generally been found by a preponderance of the evidence," and "[n]othing in *Booker* changes this analysis."  *United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. 2005).  *Booker* does not require that the jury find the facts bearing upon sentencing factors beyond a reasonable doubt. "[I]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the

---

[37]The United States had moved for a four-level upward departure under U.S.S.G. § 5K2.1 because the death of Montgomery's wife had resulted from his unlawful possession of firearms.  After a hearing, the district court found that Montgomery's offense conduct had contributed to his wife's suicide and granted a two-level upward departure.

constitutional error was the court's reliance on judge-found facts to enhance [the defendant's] sentence *mandatorily*." *United States v. Lauder*, 409 F.3d 1254, 1269 (10th Cir. 2005); *see also United States v. Dalton*, 409 F.3d 1247, 1252 (10th Cir. 2005) ("*Booker* . . . does not render judicial fact-finding by a preponderance of the evidence *per se* unconstitutional."). In *McReynolds v. United States*, 397 F.3d 479 (7th Cir.), *cert. denied*, 125 S.Ct. 2559 (2005), the Seventh Circuit observed that

> *Booker* does not in the end move any decision from judge to jury, or change the burden of persuasion. The remedial portion of *Booker* held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the Sixth Amendment so long as the guideline system has some flexibility in application.

*Id.* at 481.

### C. Villafranco and *Booker*

As best this court can tell from the papers,[38] Villafranco now disputes a four-level upward adjustment of his Base Offense Level under § 2K2.1(a)(6) of the federal Sentencing Guidelines.

---

[38]Villafranco does not make reference to specific portions of the Presentence Report he now finds objectionable under *Booker*, but he seeks "[t]he correction of the Presentence Report," "[t]he correction of the Judgment reflecting the adjusted term of imprisonment and supervised release after the removal of enhancements that were based upon facts neither admitted by Petitioner nor found by a jury to be true beyond a reasonable doubt," and "[t]o have the option to be re-sentenced under the advisory Guidelines appealable under the standard of unreasonableness review," citing *Booker*. (Petition at 10 ¶ 16.)  The only apparent "enhancement" in the Presentence Report's sentencing computation is the four-level adjustment under § 2K2.1(b)(5).

Villafranco's three-year term of Supervised Release is grounded upon the classification of the offense to which he pleaded guilty, 18 U.S.C. § 922(g)(1), which is punishable by imprisonment "for not more than 10 years" and/or imposition of a fine, 18 U.S.C. § 924(a)(2), making it a Class C felony under 18 U.S.C. § 3581(b).  18 U.S.C. § 3583(b) prescribes "the authorized terms of supervised release," which "for a Class C or Class D felony" is "not more than three years[.]" Section 3583(c) directs that "[t]he court, in determining whether to include a term of supervised release, and, if a term of supervised release is to be included, in determining the length of the term and the conditions of supervised release, shall consider the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)."

For Villafranco, the imposition of Supervised Release was not a *mandatory* sentencing "enhancement"; 18 U.S.C. § 3583(a) provides that "[t]he court, in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, *may* include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment," and thus does not implicate Sixth Amendment concerns under *Booker*.  18 U.S.C.A. § 3583(a) (2000) (emphasis added); *see also* United States Sentencing Commission, *Guidelines Manual* § 5D1.2(a)(2) (Nov. 2003).

That adjustment was based upon facts set forth in Paragraph 7 of the Presentence Investigation Report indicating that Villafranco had assaulted another person with his firearm.[39]   Relying on *Booker,* Villafranco objects that those facts were "neither admitted by Petitioner nor found by a jury to be true beyond a reasonable doubt."  (Petition at 10 ¶ 16.)

Yet as explained above, *Booker* does not limit the court's consideration of sentencing factors to only those facts either admitted by the defendant or proven beyond a reasonable doubt to a jury.  Instead, *Booker* "rendered the sentencing guidelines effectively advisory, thereby permitting the courts to continue factfinding under a preponderance of the evidence standard." United States Sentencing Commission, *Final Report on the Impact of* United States v. Booker *On Federal Sentencing* 16 (March 2006).

> In *Booker*, the Supreme Court adopted a remedy to the Sixth Amendment violation that "maintains a strong connection between the sentence imposed and the offender's real conduct—a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve."  Thus, *Booker* reaffirmed the role of relevant conduct in the advisory guideline scheme. Consequently, relevant conduct considerations continue to play an integral part of post-*Booker* sentencing.

*Id.* at 21 (footnotes omitted).  *Booker* "proscribes only judicial factfinding that increases a sentence beyond the maximum authorized by the jury verdict or supported by the defendant's

---

[39]Section 2K2.1(b)(5) of the Guidelines provides:

> (5)     If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by **4** levels. If the resulting offense level is less than level **18**, increase to level **18**.

United States Sentencing Commission, *Guidelines Manual* § 2K2.1(b)(5) (Nov. 2003).   Section 2K2.1(a)(6) of the Guidelines set a Base Offense Level of **14** for Villafranco's conviction under 18 U.S.C. § 922(g)(1).  *Id.*  An upward four-level adjustment under § 2K2.1(b)(5) and a downward three-level adjustment for acceptance of responsibility (§ 3E1.1) resulted in an Adjusted Offense Level of **15**.  Given a Criminal History Category of **VI**, the applicable Guidelines sentencing range was **41-51 months**. *Id.*, Ch. 5, Pt. A (Sentencing Table).

admissions." *Id.* at 22.

Here, Villafranco's admissions in pleading guilty to the charged violation of 18 U.S.C. § 922(g)(1) form the factual basis for the computation of his sentence under the Guidelines, starting with his Base Offense Level under § 2K2.1(a)(6).

Neither Villafranco nor his counsel objected to the additional facts set forth in the Presentence Report as bearing upon his offense conduct.  Indeed, at Villafranco's May 3, 2004 sentencing hearing, his counsel advised the court as follows:

> THE COURT: I am happy to hear from you, Mr. Athay, from the United States attorney, and from Mr. Villafranco as well.
> You have had an opportunity to go over with your client the presentence report I assume?
>
> MR. ATHAY: We have, Your Honor.  We received a copy of that.  I reviewed it with Mr. Villafranco last week.  *We believe the presentence report is accurate.*  You know, the criminal history as indicated in the report is category VI. There were a couple of those that we were considering challenging.  Unfortunately, it doesn't bring us out of category VI even if we were to be successful.  *We think that the report accurately reflects this case as it appears before you. . . .*

(Transcript of Hearing, dated May 3, 2004, at 3:16-4:4 (emphasis added).)

The "unobjected-to"/"admitted" facts set forth in the Presentence Report provide a sufficient factual basis to support the four-level upward adjustment of Villafranco's offense level under the Guidelines.

The court of appeals has recently drawn a fine-tuned distinction between unobjected-to facts being "admitted" by the defendant for Sixth Amendment purposes under *Booker* and unobjected-to facts being "admitted" for purposes of sentencing calculation under the Guidelines:

> In relying on these unobjected-to facts from the [Pre-Sentence Report], we recognize that post-*Booker* this court has refused to treat unobjected-to PSR facts as admitted for Sixth Amendment *Booker* purposes.  *See United States v. Bass*, 411

F.3d 1198, 1204 & n. 7 (10th Cir. 2005), *cert. denied*, 2006 WL 37951 (2006) (No. 05-7912).  Nevertheless, outside the *Booker* context, we will still rely on unobjected-to facts for other sentencing purposes.

> "Prior to *Booker*, we regularly held that the failure to object to a fact in a presentence report, or failure to object at the sentencing hearing, acts as an admission of fact."  *Bass*, 411 F.3d at 1204 n. 7 (quotations, alterations omitted). In *Bass*, we declined to treat a defendant's failure to object to facts in the PSR as an admission for Sixth Amendment *Booker* purposes.  *See id.*  But *Bass* did not, and could not, overturn our pre-*Booker* precedent addressing the application of guidelines, including departures from the applicable guideline range, that specifically permitted the district court to rely on unobjected-to facts in the PSR to apply those guidelines. We remain bound by that pre-*Booker* precedent.

> Further, our reliance on these unobjected-to facts for sentencing purposes outside the *Booker* context is consistent with Fed.R.Crim.P. 32(i)(3)(A), which provides that "[a]t sentencing, the court . . . may accept any undisputed portion of the presentence report as a finding of fact."  *Booker* has not relieved a defendant of his obligation under Rule 32(i)(3)(A) to point out factual inaccuracies included in the PSR.  And requiring a defendant to challenge any factual inaccuracies in the PSR before or during sentencing permits the district court to address those objections at a time and place when the district court is able to resolve those challenges.

> We therefore accept the unobjected-to facts in the PSR as admitted for sentencing purposes outside the *Booker* context.

*United States v. Wolfe*, 435 F.3d 1289, 1299 (10th Cir. 2006).

*If Booker* applied to Villafranco's *pre-Booker* sentence, then "constitutional *Booker* error" may have occurred in mandatorily adjusting his offense level upward to take into account the additional facts set forth in Paragraph 7 of the Presentence Report; and "non-constitutional *Booker* error" may have occurred in treating the Guidelines as mandatory in imposing Villafranco's sentence on May 3, 2004.  But apart from the question of "constitutional *Booker* error," the court's reliance upon unobjected-to facts in the Presentence Report in calculating Villafranco's Adjusted Offense Level under the Guidelines did not result in "an improper determination of the

applicable Guidelines range." *Kristl*, 437 F.3d at 1055.

### D. *Booker*, *Blakely* and Retroactivity

As previously noted,[40] the court of appeals has addressed the question whether either *Booker* or *Blakely* applies retroactively to criminal sentences that had already become final before *Booker* or *Blakely* was decided.  First, in *United States v. Price*, 400 F.3d 844, 849 (10th Cir. 2005), the Tenth Circuit concluded that "*Blakely* does not apply retroactively to convictions that were already final at the time the Court decided *Blakely*, June 24, 2004," and does not provide a legal basis for an initial § 2255 motion.  More recently, the court of appeals has likewise concluded that *Booker* is not retroactively applicable to cases on collateral review.  *See Bey v. United States*, 399 F.3d 1266, 1269 (10th Cir. 2005) (holding that *Booker* was not made retroactive to cases on collateral review for purposes of "second or successive" § 2255 motions);[41] *United States v. Bellamy*, 411 F.3d 1182, 1184 (10th Cir. 2005) (holding that *Booker* "does not apply retroactively to criminal cases that became final before its effective date of January 12, 2005" for purposes of initial § 2255 motions); *see also United States v. Gentry*, 432 F.3d 600, 605 & n.4 (5th Cir. 2005) ("we join the several courts of appeals that have held that *Booker* does not apply retroactively to initial § 2255 motions"); *In re Zambrano*, 433 F.3d 886, 889 (D.C. Cir. 2006) ("we conclude that *Booker* is not a new rule of constitutional law 'made retroactive to cases on collateral review by the Supreme Court' within the meaning of 28 U.S.C. § 2255.  In so

---

[40](*See* Memorandum Opinion & Order, filed March 22, 2006 (dkt. no. 6), in *Gregory Villafranco v. United States*, Civil No. 2:05-CV-250BSJ (D. Utah), at 4-5.)

[41]"Pursuant to the Supreme Court's holding in [*Tyler v. Cain*, 533 U.S. 656, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001)] we must conclude that under the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214, *Booker* may not be applied retroactively to second or successive habeas petitions."  *Bey*, 399 F.3d at 1269.

holding, we join all of the circuits that have considered the question."); *Lloyd v. United States*, 407 F.3d 608, 614 (3d Cir. 2005) ("*Booker* does not apply retroactively to cases on collateral review"); *Varela v. United States*, 400 F.3d 864, 868 (11th Cir.) (explaining that "*Booker*'s constitutional rule falls squarely under the category of new rules of criminal procedure that do not apply retroactively to § 2255 cases on collateral review"), *cert. denied*, ___ U.S. ___, 126 S. Ct. 312 (2005); *United States v. Cruz*, 423 F.3d 1119, 1120 (9th Cir. 2005) (per curiam) (same); *Green v. United States*, 397 F.3d 101 (2d Cir. 2005) (per curiam) (holding neither "*Booker* nor *Blakely* apply retroactively" to cases on collateral review); *Guzman v. United States,* 404 F.3d 139, 141-44 (2d Cir. 2005) (holding that *Booker* does not apply retroactively to cases that became final before January 12, 2005); *Humphress v. United States,* 398 F.3d 855, 860-63 (6th Cir. 2005); *McReynolds v. United States,* 397 F.3d 479 (7th Cir.2005).

The Supreme Court has not yet expressly decided the retroactivity question as to either *Blakely* or *Booker*,[42] but controlling Tenth Circuit precedent indicates that because his conviction and sentence became final before June 24, 2004, Villafranco "cannot challenge his sentence under either *Blakely* or *Booker*" on collateral review.  *United States v. Sullivan*, 160 Fed. Appx. 728, 730 (10th Cir. 2005).

Villafranco appears to acknowledge this, and attempts to argue around the point in seeking a writ of *audita querela*: "Booker . . . occurred after the Judgment in question was rendered; and,

---

[42]On November 28, 2005, the Supreme Court denied review in eleven cases, including *Clark v. United States*, No. 05-5491 (petition for certiorari filed July 18, 2005), presenting the *Booker* retroactivity issue.  According to the Seventh Circuit, "Although the Supreme Court did not address the retroactivity question in *Booker*, its decision in *Schriro v. Summerlin*, [542] U.S. [348], 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), is all but conclusive on the point.  *Summerlin* held that *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)—which, like *Booker*, applied [Sixth Amendment] principles to a particular subject—is not retroactive on collateral review."  *McReynolds*, 397 F.3d at 480 (Easterbrook, J.).

their opinions **do not** render the entire Judgment unlawful, irregular or invalid in order to collaterally attack it in a § 2255." (Petition at 5 ¶ 7.) "'[T]his change affected the way in which the court's judgment and sentence would be performed but it did not affect the lawfulness of the judgment itself—then or now.' <u>Addonizio</u>, Id. at 442 U.S. 187. Thus the only available avenue is the Writ of Error Audita Querela." (*Id.* at 5-6 ¶ 7; *see id.* at 9-10 ¶ 15 (same).)[43] Yet the relief he seeks—"correction of the Presentence Report," the "correction of the Judgment" to reflect an adjusted term of imprisonment and supervised release, or alternatively, resentencing under *Booker*'s advisory Guidelines system—plainly affect the judgment in his criminal proceeding, not simply the manner in which that judgment is to be executed. (*Id.* at 10 ¶ 16.)

### IV.  VILLAFRANCO, *BOOKER* AND *AUDITA QUERELA*

Villafranco contends that based upon *Booker*, his Sixth Amendment right to trial by a jury was violated when this court, treating the federal Sentencing Guidelines as mandatory, sentenced him under the applicable Guidelines provisions. He asserts that he is bringing his claim in the form of a petition for a writ of *audita querela* because a 28 U.S.C. § 2255 motion may prove to be inadequate, ineffective, and inapplicable where *Booker* (and, for that matter, *Blakely*) was announced after Villafranco's conviction and sentence became final, and as explained above, the Tenth Circuit has ruled that *Booker* does not apply retroactively to cases on collateral review.

"If in such circumstances, Section 2255 cannot correct the errors, because they are not cognizable for collateral attack," Villafranco submits, "the Common Law Writ of Error Audita

---

[43]*United States v. Addonizio*, 442 U.S. 178 (1979), held that a postsentencing change in the policies of the United States Parole Commission that prolonged a defendant's actual imprisonment beyond the period intended by the sentencing judge will not support a collateral attack on his original sentence under 28 U.S.C. § 2255. 442 U.S. at 184-90.

Querela would provide the relief sought." (Petition at 10.) "Petitioner is seeking to use the newly

created right [under *Booker*] that was not available before the Judgment in question was

rendered." (*Id.* at 7.) In filing his petition, Villafranco insisted that "[t]his is not a Motion under

28 U.S.C. §2255." (Letter to Clerk, U.S. District Court, received May 9, 2005 (dkt. no. 2).)

The question thus presented for decision is whether a petitioner may seek relief for

"*Booker* error" in his sentencing by writ of *audita querela* where *Booker* has been held not to be

retroactive to "cases on collateral review" and thus cannot be raised by a motion under § 2255.

**A.** ***Booker* and *Audita Querela***

Taking Villafranco's petition at face value, he seeks a common-law writ of *audita querela*.

Under the historical definition of the writ of *audita querela*, "when granted in circumstances in

which the matter had arisen after judgment, it was presumed that the judgment was sound at the

time it was granted." Ira P. Robbins, *The Revitalization of the Common-Law Civil Writ of Audita

Querela as a Postconviction Remedy in Criminal Cases: The Immigration Context and Beyond*, 6

Geo. Immigr. L.J. at 682. At first glance, Villafranco's petition appears to comport with the law

dictionary definition of *audita querela* as a means to "obtain relief against the consequences of the

judgment, on account of some matter of defense or discharge, *arising since its rendition* and

which could not be taken advantage of otherwise," *Black's Law Dictionary* 167 (4th rev. ed.

1968) (emphasis added),[44] and the language of opinions such as *Doe*: "At common law *audita

querela* was available only to relieve a judgment debtor where a legal defense or discharge *arose*

---

[44]Villafranco asserts that the "Section 2255 procedure is deemed inadequate or ineffective in order to apply the
Supreme Court's decision found in *Booker*," (Petition at 7 ¶ 11), and that he "is seeking to use the newly created right
that was not available before the Judgment in question was rendered," as a "newly existing legal defense" that "had
arisen since the judgment" was rendered, within the dictionary definition of *audita querela*. (*Id.* at 7-8 ¶ 11 (quoting five
editions of *Black's Law Dictionary*).)

*subsequent to the judgment.*" *Doe*, 120 F.3d at 203 (emphasis added).

But as *Doe* further explained, "Courts have noted that the difference between *coram nobis* and *audita querela* is one of *timing*, not substance." *Id.* at 203 n.4 (emphasis added).  According to the Tenth Circuit,

> Writs of audita querela and coram nobis "are similar, but not identical." *United States v. Reyes*, 945 F.2d 862, 863 n.1 (5th Cir. 1991).  Usually, a writ of coram nobis is used "to attack a judgment that was infirm [at the time it issued], for reasons that later came to light."  *Id.*  By contrast, a writ of audita querela is used to challenge "a judgment that was correct at the time rendered but which is rendered infirm by matters which arise after its rendition."  *Id.*

*Torres*, 282 F.3d at 1245 n.6.

Villafranco points out that the *Booker* decision arose subsequent to rendition of the judgment in his criminal proceeding, identifying a constitutional infirmity that he now detects in his own May 3, 2004 sentencing—the *mandatory* application of the federal Sentencing Guidelines based upon facts not expressly admitted by him or found by a jury beyond a reasonable doubt.

### 1.  "*Booker* Error" and § 2255 as an "Exclusive Remedy"

The very nature of "constitutional *Booker* error,"—that is, a denial of the Sixth Amendment right to jury trial by mandatory Guidelines sentencing—suggests that Villafranco is "'attack[ing] a judgment that was infirm [at the time it was issued] for reasons that later came to light'"—raising a claim cognizable under § 2255 (or habeas corpus or *coram nobis*),[45] rather than

---

[45]This is likely what the Eleventh Circuit had in mind when it held "that a writ of *audita querela* may not be granted when relief is cognizable under 28 U.S.C. §2255, as it is here."  *United States v. Holt*, 417 F.3d at 1175; *see id.* ("Because, in the instant case, Holt is collaterally attacking his sentence as violating the United States Constitution, the proper avenue of relief is §§ 2255."); *United States v. Jackson*, 157 Fed. Appx. 252, 253 (11th Cir. 2005) ("'[F]ederal courts may properly fill the interstices of the federal postconviction remedial framework through remedies available at common law.' *Id.* at 1175 (internal quotation omitted).  The writ of *audita querela,* however, may not be granted when relief is cognizable under §§ 2255.  *Id.*  Because Jackson is collaterally attacking his sentence as unconstitutional, the appropriate avenue of relief is §§ 2255." (footnote omitted) (quoting *Holt*, 417 F.3d at 1175)); *see also United States v. Aguilar*, Nos. 04-8015, 05-7099, 2006 WL 228699 (4th Cir., decided January 30, 2006) ("Turning to Aguilar's petition

(continued...)

attacking "'a judgment that was correct at the time rendered but which is rendered infirm by matters which arise after its rendition'" and "which for some reason could not have been raised at trial"[46] or on appeal, thereby raising an *audita querela* claim.

The Sixth Amendment has been part of the Constitution since 1791.  If *mandatory* Guidelines sentencing enhancements based upon judge-found facts violated the Sixth Amendment on January 12, 2005—the date *Booker* was decided—then it follows that the same mandatory sentencing scheme also violated the same Sixth Amendment on and after November 1, 1987, the effective date of the Guidelines.  And the same would have been true on May 3, 2004, the date that Villafranco's sentence was imposed, and May 20, 2004, the date his judgment was entered.  That being so, Villafranco's judgment could not be "correct at the time rendered" because of the defect Villafranco now asserts.

Can he nevertheless raise "*Booker* error" by petition for a writ of *audita querela*?

Cases such as *Ayala* suggest that such relief is not available: "To be sure, not all postjudgment changes in law may be raised in a section 2255 proceeding . . . [b]ut we have little doubt that a defendant challenging his conviction collaterally may not style his motion as a petition for a writ of audita querela simply to evade the Supreme Court's painstakingly formulated 'retroactivity' rules.  *Cf. Kimberlin*, 675 F.2d at 869 (audita querela 'cannot lie simply to enable a defendant to [avoid] . . . complying with the rules governing [section 2255] motions')."  *Ayala*,

---

[45](...continued)
for writ of *audita querela*, we find that because §§ 2255 exists as a vehicle for collaterally attacking a conviction or sentence, the use of an extraordinary writ for the same purpose is inappropriate.").

[46]*Gonzalez*, 152 Fed. Appx. at 746, 2005 WL 2767246, at *2 (quoting *Torres*, 282 F.3d at 1245 n.6, and citing *Black's Law Dictionary* 131 (6th ed.1990)).

894 F.2d at 429 n.8.[47]

Moreover, in *Melton v. United States*, the Seventh Circuit held a defendant's petition for a writ of *audita querela* to be a "second or successive" motion under § 2255, emphasizing that the substance of the relief sought by a petitioner prevails over the caption:

> Prisoners cannot avoid the AEDPA's rules by inventive captioning. *See, e.g.*, *Owens v. Boyd,* 235 F.3d 356 (7th Cir. 2000) (application for coram nobis); *United States v. Evans,* 224 F.3d 670 (7th Cir. 2000) (use of Rule 33 based on matters other than newly discovered evidence of innocence). Any motion filed in the district court that imposed the sentence, and substantively within the scope of § 2255 ¶ 1, *is* a motion under § 2255, no matter what title the prisoner plasters on the cover. See, e.g., *Ramunno v. United States,* 264 F.3d 723 (7th Cir. 2001). Call it a motion for a new trial, arrest of judgment, mandamus, prohibition, coram nobis, coram vobis, audita querela, certiorari, capias, habeas corpus, ejectment, quare impedit, bill of review, writ of error, or an application for a Get-Out-of-Jail Card; the name makes no difference. It is substance that controls. . . .

359 F.3d at 857 (emphasis in original) (citing *Thurman v. Gramley,* 97 F.3d 185, 186-87 (7th Cir. 1996)).[48]

In a similar fashion, the Tenth Circuit rejected a defendant's petition for a writ of *audita querela* raising "*Booker* error" as to a sentence that had already become final before *Booker* was decided:

> In its order denying his motion [for a writ of error *audita querela*], the district court concluded that (1) a motion under § 2255 was neither inadequate nor unavailable to Mr. Gonzalez for purposes of challenging the legality of his 85-month sentence under *Booker*, and (2) that § 2255 remained the exclusive means by which he could raise such a challenge. In addition, the district court determined that because

---

[47]In *United States v. Valdez-Pacheco,* 237 F.3d 1077, 1080 (9th Cir. 2001), the Ninth Circuit stated that "[a] prisoner may not circumvent valid congressional limitations on collateral attacks by asserting that those limitations create a gap in the post-conviction remedies that must be filled by the common law writs," specifically audita querela. *Accord United States v. Coleman,* 162 Fed.Appx. 163, 165 (3rd Cir. 2006) (citing *Valdez-Pacheco*, 237 F.3d at 1080).

[48]Based upon his allegations of ineffective assistance of counsel, the *Melton* court found that "Melton's application fits comfortably within" the coverage of § 2255, and "[i]t therefore was a motion under § 2255, notwithstanding its caption" as a petition for a writ of *audita querela*. *Id.*

> *Booker* was not retroactively available for challenging sentences in any postconviction proceeding once a defendant's conviction has become final, his motion, however characterized, could not be granted.  We agree with the district court's reasoning.

*Gonzalez*, 152 Fed. Appx. at 745, 2005 WL 2767246, at *2.[49]  *Gonzalez* likewise affirmed the district court's re-characterization of Gonzalez' petition for a writ of *audita querela* as a motion under § 2255, "the exclusive means for Mr. Gonzalez to test his conviction in the sentencing court."  *Id.*, 152 Fed. Appx. at 746, 2005 WL 2767246, at *3.

These cases indicate that because allegations of "constitutional *Booker* error" raise the question whether  "the sentence was imposed in violation of the Constitution . . . of the United States," 28 U.S.C. § 2255 ¶ [1], they raise a claim for which § 2255 is the exclusive remedy, and for which relief by writ of *audita querela* is not available.  *See Torres*, 282 F.3d at 1245 ("a writ of *audita querela* is 'not available to a petitioner when other remedies exist, such as a motion to vacate sentence under 28 U.S.C. § 2255.'"); Part II.C, *supra*.  As explained above (*see supra* Part II.E), this is true even of those cases to which *Booker* finds no retroactive application.

### 2. *Booker* and Non-Retroactivity Under *Teague*

Another federal district court considering the same question recently concluded that given the Second Circuit's ruling that *Booker* "'does not apply to cases on collateral review where the defendant's conviction was final as of January 12, 2005,'" the "petitioner is not caught in a gap between remedies that may be filled by the use of a common law writ, rather, he is absolutely barred from presenting his claim because the Supreme Court's holding in *Booker* does not apply

---

[49]*Gonzalez* was not selected for publication in the *Federal Reporter, Third Series*, and under Tenth Circuit Rule 36.3 the order has very limited authority as precedent.  This court has cited to *Gonzalez* as an example rather than as controlling case authority on the questions presented here.

to his conviction and sentence." *Tobias v. United States,* No. 3:06CV123, 2006 WL 287197, at *1 (D. Conn., decided February 7, 2006) (quoting *Guzman v. United States*, 404 F.3d 139, 144 (2d Cir. 2005)).  "Put another way, *Booker* cannot be used to find petitioner's sentence illegal regardless of how he presents this claim to the court."  *Id.*[50]

Thus, both *Gonzalez* and *Tobias* conclude that *Booker*'s blanket non-retroactivity to criminal judgments that had already become final before *Booker* was announced precludes post-conviction relief *in any form*, regardless of caption or pleading—and independent of the question whether "*Booker* error" would be cognizable under § 2255 as a petitioner's exclusive remedy.

Clearly, *Booker* is a matter "arising subsequent to the rendition" of the judgment in Villafranco's criminal proceeding, at least in the strictly temporal sense that *Booker* was in fact decided more than seven months after Villafranco's judgment became final.  But as applied to *Booker*, the "Supreme Court's painstakingly formulated 'retroactivity' rules" simply indulge in the convenient temporal fiction that "constitutional *Booker* error" did not actually exist until the day that *Booker* was announced, except as to "all cases on direct review."[51]

---

[50]The Third Circuit recently reached essentially the same conclusion in *United States v. Hannah*, No. 05-4863 2006 WL 655083, *2 (3rd Cir., decided March 15,  2006):

> Hannah cannot use *audita querela* in order to evade the AEDPA's stringent requirements for filing second or successive §§ 2255 motions.  *See Valdez-Pacheco,* 237 F.3d at 1080.  *See also United States v. Kimberlin,* 675 F.2d 866, 869 (7th Cir.1982).  Hannah's claim is cognizable under §§ 2255; therefore, there is no "gap" in post-conviction remedies.  *See Valdez-Pacheco,* 237 F.3d at 1080. The fact that *Booker* cannot be applied retroactively in his case does not create such a gap.  *See Cradle [v. United States ex rel. Miner,* 290 F.3d 536 (3d Cir. 2002) (per curiam)] at 538 ("[i]t is the inefficacy of the remedy, not the personal inability to use it, that is determinative").

2006 WL 655083, at *2.  *Accord United States v. Hill,* 163 Fed. Appx. 540, 540-41 (9th Cir. 2006) (affirming denial of writ of *audita querela* because the Ninth Circuit had held that *Booker* "does not apply retroactively to convictions that became final prior to its publication.  *See United States v. Cruz,* 423 F.3d 1119, 1121 (9th Cir. 2005) (per curiam)").

[51]In *Bellamy,* 411 F.3d at 1187-88, the court of appeals explained the steps in the applicable retroactivity analysis that lead to its conclusion that "constitutional *Booker* error" did not exist until January 12, 2005—at least from

(continued...)

-43-

This temporal fiction finds root in the Supreme Court's conclusion that on collateral

review, a conviction should generally be reviewed by reference to the "'law prevailing at the time

a conviction became final.'" *Teague v. Lane*, 489 U.S. 288, 306 (1989) (O'Connor, J., joined by

Rehnquist, C. J., Scalia and Kennedy, JJ.) (quoting *Mackey v. United States*, 401 U.S. 667, 689

(1971) (Harlan, J., concurring in judgments in part and dissenting in part).  "Unless they fall

within an exception to the general rule, new constitutional rules of criminal procedure will not be

applicable to those cases which have become final before the new rules are announced."  *Id.* at

310.[52]

That conclusion, in turn, finds its roots in concerns for the finality of criminal judgments:

> Application of constitutional rules not in existence at the time a conviction became
> final seriously undermines the principle of finality which is essential to the
> operation of our criminal justice system.  Without finality, the criminal law is

---

[51](...continued)
the standpoint of criminal judgments that had become final before that date—and this court will not repeat that
explanation here.  There appears to be little doubt that the rule of decision in *Booker*, rooted as it is in the jury trial
guarantee of the Sixth Amendment, can fairly be called a "new" constitutional rule of criminal procedure.  *Cf. Browning
v. United States*, 241 F.3d 1262, 1266 (10th Cir. 2001) (en banc).

[52]As Justice O'Connor acknowledged, "Retroactivity is properly treated as a threshold question, for, once a new
rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied
retroactively to all who are similarly situated."  *Teague*, 489 U.S. at 300.  Yet in *Teague*, considerations of finality prevail
over the requirements of "evenhanded justice."  *Cf. Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406 (1932) ("[I]n
most matters it is more important that the applicable rule of law be settled than that it be settled right.") (Brandeis, J.,
dissenting).
    Under *Teague*, new rules of constitutional criminal procedure do not apply retroactively on collateral review
unless they fall into either of  two narrow exceptions: (1) new rules that "place an entire category of primary conduct
beyond the reach of the criminal law," or "that prohibit imposition of a certain type of punishment for a class of
defendants because of their status or offense"; or (2) "'new watershed rules of criminal procedure' that are necessary to
the fundamental fairness of the criminal proceeding."  *Sawyer v. Smith*, 497 U.S. 227, 241-42 (1990).  As to the second
exception,

> It is thus not enough under *Teague* to say that a new rule is aimed at improving the accuracy of trial.
> More is required.  A rule that qualifies under this exception must not only improve accuracy, but also
> "'alter our understanding of the bedrock procedural elements'" essential to the fairness of a
> proceeding.  *Teague*, *supra*, 489 U.S., at 311, 109 S.Ct., at 1076 (plurality opinion) (quoting *Mackey*,
> 401 U.S., at 693, 91 S.Ct., at 1180).

497 U.S. at 242.

deprived of much of its deterrent effect.  The fact that life and liberty are at stake in criminal prosecutions "shows only that 'conventional notions of finality' should not have *as much* place in criminal as in civil litigation, not that they should have *none*."  Friendly, Is Innocence Irrelevant? Collateral Attacks on Criminal Judgments, 38 U. Chi. L. Rev. 142, 150 (1970).  "[I]f a criminal judgment is ever to be final, the notion of legality must at some point include the assignment of final competence to determine legality."  Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 450-451 (1963) (emphasis omitted).  See also Mackey, 401 U.S., at 691  (Harlan, J., concurring in judgments in part and dissenting in part) ("No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation").

489 U.S. at 309.

"These underlying considerations of finality," then, are the reason why that—as far as post-judgment relief from Villafranco's May 20, 2004 Judgment in a Criminal Case is concerned—it is as if *Booker* had never been decided.  *See Bellamy*, 411 F.3d at 1186-88 (applying *Teague v. Lane* retroactivity standards to *Booker*).[53]

If *Gonzalez* is correct that "*Booker* was not retroactively available for challenging

_____

[53]Though *Teague v. Lane* was decided in the context of a state prisoner's petition for a federal writ of habeas corpus, *see* 28 U.S.C. § 2254 (2000), its retroactivity standards have been applied to federal post-conviction remedies without distinction between statutory remedies and common-law writs.  *See, e.g.*, *Daniels v. United States*, 254 F.3d 1180, 1194 (10th Cir. 2001) (en banc) (holding that "*Teague's* nonretroactivity doctrine applies equally to habeas petitions brought under sections 2254 and 2255"); *United States v. Sanchez-Cervantes*, 282 F.3d 664, 667-68 (9th Cir. 2002) (same); *Love v. Menifee*, 333 F.3d 69, 74 (2d Cir. 2003) (explaining that *Teague* analysis applies for purposes of habeas corpus under 28 U.S.C. § 2241); *Dohrmann v. United States*, ___ F.3d ___, 2006 WL 623652, at *2 (11th Cir. 2006) (same); *United States v. Mandanici*, 205 F.3d 519, 527 (2d Cir. 2000) (stating that "we now hold that *Teague* applies to *coram nobis* petitions.  *See United States v. Swindall*, 107 F.3d 831, 833-34 & n. 4 (11th Cir. 1997) (applying *Teague* to a *coram nobis* petition); *United States v. Nazon*, 936 F. Supp. 563, 568-69 (N.D. Ind. 1996) (same)."); *United States v. Swindall*, 107 F.3d 831, 834 (11th Cir. 1997) ("[W]e hold that if *Teague* bars a petitioner's claim relying on a case decided after his conviction and sentence became final, then he has not suffered such compelling injustice that would deserve relief pursuant to a writ of error *coram nobis*."); *cf. Ayala*, 894 F.2d at 429 n.8 ("[A] defendant challenging his conviction collaterally may not style his motion as a petition for a writ of audita querela simply to evade the Supreme Court's painstakingly formulated 'retroactivity' rules." (citing *Teague*)).

    *Gonzalez* indicates that at least one panel of the Tenth Circuit has implicitly adopted the view that the "law-at-the-time" retroactivity standards of *Teague v. Lane* must apply for the purposes of *all* federal post-conviction remedies in "any postconviction proceeding," including *audita querela*.  As noted above, *Gonzalez* does not have binding effect as precedent, and in the context of this case, this court need not and does not decide whether the *Teague* standards apply to all writs and in all contexts, including a petition for a writ of *audita querela* sought in an appropriate case.

-45-

sentences in *any postconviction proceeding* once a defendant's conviction has become final,"[54]
then as *Tobias* concluded, *Booker* does not apply to Villafranco's conviction and sentence, and
cannot serve as "a valid defense to the judgment" for purposes of *audita querela*. *Oliver*, 157
F.2d at 153. In effect, *Booker* was announced "after rendition," but did not "arise after rendition"
*as a valid defense* to the enforcement of Villafranco's judgment, thereby serving as a basis for
issuance of the writ. Villafranco's May 20, 2004 Judgment is still presumed to be sound at the
time it was entered, no valid defense to its enforcement has since arisen, and as *Tobias* concluded,
there is no remedial "gap" for *audita querela* to fill.

In contrast to Villafranco's reliance on *Booker*, the prior cases in which relief in the nature
of *audita querela* was granted because of "post-judgment changes in the law" (*Salgado*,
*Ghebreziabher*, *Ejelonu*) involved changes accomplished by post-judgment *congressional
legislation* directly related to the collateral consequences of the petitioners' criminal
judgments—specifically, the deportation of immigrants based upon prior criminal convictions.
They did not involve non-retroactive Supreme Court decisions addressing questions of
constitutional criminal procedure affecting the validity of an original conviction or sentence.

### 3. "*Booker* Error" and the "Absence of a Legal Remedy"

Moreover, *audita querela* "contemplates . . . the absence of a legal remedy, including the
right of appeal." *Oliver*, 157 F.2d at 153. *See also Turner v. Davies*, 2 Wms. Saund. 137, 85 Eng.
Rep. 871, 879 n.(1) (K.B. 1670) (Reporter's Note observing that "[a]n *audita querela* is a

---

[54]152 Fed. Appx. at 745, 2005 WL 2767246, at *2 (emphasis added). If as *Gonzalez* suggests, § 2255 serves as
Villafranco's "exclusive remedy for . . . attacking the legality of his detention," *Caravalho v. Pugh*, 177 F.3d at 1178,
subject to the procedural limitations imposed by Congress and by the "Supreme Court's painstakingly formulated
'retroactivity' rules" limiting the § 2255 remedy; and if § 2255 is not rendered "inadequate or ineffective" because
*Booker* is held not to be retroactive to cases on collateral review, then there is no "gap" in federal post-conviction
remedies that may be filled by a writ of *audita querela*.

commission to the Judges to examine the cause . . . [a]nd it does not lie where there is any other

remedy at law either by plea, or otherwise").  The writ could not be used where the defendant lost

the defense due to his or her own neglect.  *Id.*

Nothing prevented Villafranco from raising a Sixth Amendment objection to mandatory

Guidelines sentencing at any time during his criminal proceeding, or on direct appeal after

judgment was entered on May 20, 2004, one month before the Supreme Court announced its

decision in *Blakely* striking down a state mandatory sentencing scheme on Sixth Amendment

grounds.  The Sixth Amendment issue was not one of "which the party could not have availed

himself in a court of law," *Humphreys*, 50 U.S. (9 How.) at 313, had Villafranco pursued a direct

appeal.[55]

But Villafranco did not object at or before his sentencing, and he did not file an appeal.

### 4. Summary

As explained above, Villafranco's petition for a writ of *audita querela* fails for three legal

reasons: (1) the intrinsic nature of "constitutional *Booker* error" necessarily calls into question the

fundamental validity and legality of his sentence under the Sixth Amendment at the time sentence

was imposed—an objection properly raised at or before the time of sentencing, on direct appeal,

*see* 18 U.S.C. § 3742(a), or by motion under § 2255, rather than by petition for a writ of *audita*

*querela*; (2) Villafranco has failed to demonstrate "the absence of a legal remedy, including the

---

[55]If Villafranco had filed a notice of appeal on or before June 4, 2004, his appeal would have been pending on June 24, 2004, when the *Blakely* decision was announced, and likely would still have been pending when *Booker* was announced in January of 2005.  *Booker* was expressly made applicable to all cases pending on direct appeal.  *Booker*, 543 U.S. at 268 ("[W]e must apply today's holdings—both the Sixth Amendment holding and our remedial interpretation of the Sentencing Act—to all cases on direct review.").  *See also United States v. Labastida-Segura*, 396 F.3d 1140, 1142-43 (10th Cir. 2005) (concluding that a *Blakely* objection sufficiently preserves a claim of error under *Booker*); *United States v. Marshall*, 432 F.3d 1157, 1160 (10th Cir. 2005) (same).

right of appeal," *Oliver*, 157 F.2d at 153, through which to raise his Sixth Amendment objections, as is required to obtain relief in the nature of a writ of *audita querela*; Villafranco could have raised the Sixth Amendment issue at or before sentencing or on direct appeal—as Booker himself did[56]—but Villafranco did not; and (3) if *Gonzalez* and *Tobias* are correct, *Booker*'s blanket non-retroactivity under *Teague* standards renders "constitutional *Booker* error" unavailable as a "valid defense to the judgment" for purposes of *audita querela*, even assuming that Villafranco's petition satisfies the other requisites of *audita querela* relief. *Booker* would likewise be unavailable as the legal basis for any other post-conviction proceeding in any case in which the defendant's conviction had become final before January 12, 2005.

### B.  Equitable Considerations re: Villafranco's Sentence

Even assuming that *Booker* reflects "a legal defense or discharge [that] arose subsequent to the judgment" for purposes of *audita querela*, the "essentially equitable" nature of *audita querela* requires Villafranco to show that "it would be contrary to justice to allow" the judgment in his criminal proceeding "to be enforced, because of matters arising subsequent to the rendition thereof," *i.e.*, that in light of *Booker* it would be "against conscience" to execute such a judgment under all the circumstances of his case.

Villafranco's petition does not point to any consequence of the judgment rendered in his criminal proceeding from which he seeks relief, other than his continuing service of the 48-month

---

[56]Such an objection had already been raised by Freddie J. Booker on a direct appeal filed in December of 2003. *See United States v. Booker*, 375 F.3d 508 (7th Cir., decided July 9, 2004). The Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," anticipated to some extent the Court's Sixth Amendment rulings in *Blakely* (2004) and *Booker* (2005). *Cf. United States v. Riccardi*, 405 F.3d 852, 874 (10th Cir. 2005) (noting that "the government concedes that Mr. Riccardi's timely *Apprendi* objection adequately preserved his *Booker* argument . . . ."); *United States v. Glover*, 413 F.3d 1206, 1210 (10th Cir. 2005) (assuming "that Mr. Glover's *Apprendi* objection also preserved his non-constitutional *Booker* argument given the unsettled state of the law").

sentence of imprisonment imposed upon him pursuant to the federal Sentencing Guidelines, to be followed by a three-year term of supervised release.

He does not allege that he is facing deportation, or some other harsh or draconian collateral consequence.  Villafranco is facing the prospect of serving the balance of his sentence, and he seeks "[t]he correction of the Judgment reflecting the adjusted term of imprisonment and supervised release *after the removal of enhancements* that were based upon facts neither admitted by Petitioner nor found by a jury to be true beyond a reasonable doubt," and "[t]o have the option to be re-sentenced under the advisory Guidelines appealable under the standard of unreasonableness review," citing *Booker*.  (Petition at 10 ¶ 16 (emphasis added).)

As explained above, evaluating Villafranco's existing sentence in light of *Booker* does not limit the available sentencing factors to those based solely upon facts admitted by the defendant or found by a jury beyond a reasonable doubt.  *See supra* Part III.B; *Montgomery*, 439 F.3d at 1262.

To the contrary, if it had been imposed today under *Booker*'s "advisory" Guidelines system, his sentence would be determined in essentially the same way as it was in May of 2004, namely, by application of § 2K2.1 of the Guidelines, based upon his guilty plea to Count I of the Indictment.  The only change would be the degree of flexibility in applying the Guidelines system. *See United States v. Kristl*, 437 F.3d at 1053-55.

Under *Booker*'s advisory Guidelines system, Villafranco's existing 48-month Guidelines sentence would be presumptively reasonable, and would not exceed the statutory maximum authorized by his guilty plea to the offense charged in Count I of the Indictment.[57]

---

[57]In contrast to *Booker* and *Blakely*, the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *did* apply to Villafranco's May 2004 sentencing.  Construing the Sixth Amendment jury trial guarantee, *Apprendi*

(continued...)

Thus, Villafranco would likely receive much the same sentence today as he did pre-*Booker*, were he to be re-sentenced as he now asks.  Other than his allegations of "*Booker* error," he has not advanced any substantial reason to conclude that a lesser sentence should or would be imposed.

The prior cases in which relief in the nature of *audita querela* was granted did nothing to alter or abate the petitioners' original criminal penalties in those cases.  In fact, in *Ejelonu* the relief granted by writ of *audita querela* was expressly conditioned upon the petitioner's completion of her obligations as a juvenile offender under the applicable Michigan statute: "The writ prohibits DHS from using Petitioner's Youthful Trainee status to demonstrate Petitioner's statutory eligibility for deportation as long as Petitioner completes her obligations under the Holmes Youthful Trainee Act." *Ejelonu*, 355 F.3d at 552.

Villafranco offers no explanation as to why a court should find that his existing sentence "would shock the conscience," *id.* at 550, and represents "a punishment grossly disproportionate to the offense," *id.* at 551.  Indeed, it appears entirely consistent with the historical uses of the writ of *audita querela* for a petitioner to first satisfy the judgment by serving his sentence before obtaining relief against other harsh collateral consequences of its continued enforcement.[58]

---

[57](...continued)

held that any fact, other than a prior conviction, that raises the penalty for a crime beyond the statutory maximum must be proved to a jury beyond a reasonable doubt.  530 U.S. at 490.

Villafranco's offense of conviction under 18 U.S.C. § 922(g)(1) is punishable by imprisonment "for not more than 10 years" and/or imposition of a fine, 18 U.S.C. § 924(a)(2), and a term of Supervised Release of up to three years. *See supra* note 38.  "Because no statutory maximum was exceeded, there is no *Apprendi* violation." *United States v. Hernandez*, 436 F.3d 851, 856 (8th Cir. 2006) (footnote omitted).

[58]Professor Robbins adopted this view in discussing *United States v. Haro*, No. CR 85-00612 WJR (C.D. Cal. May 30, 1990):

Perhaps the formulation of the writ most true to its historical origins was given in 1990 in *United*

(continued...)

Villafranco's petition simply fails to establish any basis for this court to conclude that the continued enforcement of the judgment in his criminal proceeding is "against conscience" or "contrary to justice," and that his case is among those few "most extreme cases" that warrant equitable relief in the nature of a writ of *audita querela*.  *Ejelonu*, 355 F.3d at 552; *Oliver*, 157 F.2d at 153.

## SUMMARY

*Audita querela* is "'[t]he name of a common law writ constituting the initial process in an action brought by a judgment defendant to obtain relief against the consequences of the judgment on account of some matter of defense or discharge arising since its rendition and which could not be taken advantage of otherwise.'" *Holder*, 936 F.2d at 2 (quoting *Black's Law Dictionary* 120 (5th ed. 1979)).  As the Supreme Court recognized in *United States v. Morgan*, 346 U.S. 502 (1954), even after the enactment of 28 U.S.C. § 2255, relief in the nature of common-law writs such as *audita querela* remains available to "'fill the interstices of the federal post conviction remedial framework,'" *United States v. Valdez-Pacheco*, 237 F.3d at 1079, affording a defendant equitable relief as to the collateral consequences of the enforcement of a criminal judgment "which it would be contrary to justice to allow to be enforced, because of matters arising

---

[58](...continued)
*States v. Haro*.  After accepting audita querela as a legitimate method of obtaining post-conviction relief, the court defined audita querela as a writ "used to vacate a judgment upon a showing that events occurring after the entry of judgment cause the continued existence of the judgment to be contrary to the interests of justice."  It then noted that a defense or discharge was required to issue the writ at common law, but that "the basic principle seems to have been that there had been a satisfaction of the judgment."  In the criminal context, the court found this satisfaction to be the serving of the sentence; after the sentence is served, the defendant can be said to have been discharged.  Thus, the court in *Haro* decided that the first step in granting audita querela relief is that the petitioner must have served his or her sentence.

Ira P. Robbins, *The Revitalization of the Common-Law Civil Writ of Audita Querela as a Postconviction Remedy in Criminal Cases:  The Immigration Context and Beyond,* 6 Geo. Immigr. L.J. at 683-84.

subsequent to the rendition thereof," *Oliver*, 157 F.2d at 153; *Ejelonu*, 355 F.3d at 545-48.

In *United States v. Booker*, 543 U.S. 220 (2005), a case decided after the judgment in Villafranco's criminal proceeding had become final, the Supreme Court held that the mandatory application of the federal Sentencing Guidelines to judge-found facts (other than a prior conviction) violates the Sixth Amendment.  Rather than declare the Guidelines unconstitutional, the Court excised the provision of the federal sentencing statute that made the Guidelines mandatory, 28 U.S.C. § 3553(b)(1), effectively making the Guidelines "advisory."

Villafranco complains that his sentence reflects the mandatory application of the Guidelines to judge-found facts not admitted by his guilty plea or found by a jury beyond a reasonable doubt, *i.e.*, "constitutional *Booker* error," and that this defect should be remedied by issuance of a writ of *audita querela* requiring either that the length of his sentence be reduced or that he be re-sentenced under *Booker*'s "advisory" Guidelines system.

Generally speaking, new rules of constitutional criminal procedure "will not be applicable to those cases which have become final before the new rules are announced."  *Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion).  To date, the Supreme Court has not decided whether *Booker* applies retroactively to cases on collateral review.  The court of appeals has held that *Booker* is not retroactive and does not apply to cases in which the judgment became final before January 12, 2005, the date that *Booker* was announced.[59]  Because Villafranco's judgment became final before *Booker* was decided, he may not raise allegations of "*Booker* error" in attacking his sentence either by motion under § 2255, or by petition for a writ of *audita querela* on

---

[59]As summarized above (*see supra* Part III.D), the Tenth Circuit and most other circuits have determined that *Booker* is not retroactively applicable to cases on collateral review.  *See United States v. Bellamy*, 411 F.3d 1182 (10th Cir. 2005) (holding that *Booker* does not apply retroactively to convictions that were final at the time it was decided on January 12, 2005).

the theory that *Booker*'s non-retroactivity renders § 2255 "inadequate or ineffective" as a post-conviction remedy.

Moreover, Villafranco's allegations of "constitutional *Booker* error" go to the fundamental legality of his sentence—a subject within the scope of a motion under § 2255 (addressing claims that "the sentence was imposed in violation of the Constitution . . . of the United States") rather than that of *audita querela*—and Villafranco was not precluded from raising his Sixth Amendment objections to mandatory Guidelines sentencing either at or before his sentencing, or on direct appeal, had he chosen to appeal.  But he did not appeal his sentence.

At this point, it appears that *Booker* is simply not available to Villafranco as a legal basis for collateral review of his sentence, by petition for a writ of *audita querela* or otherwise.

Yet even if *Booker* could serve as "a valid defense to the judgment" for purposes of *audita querela*—one for which Villafranco could show that he had no "legal remedy, including the right of appeal," *Oliver*, 157 F.2d at 153—Villafranco nevertheless has failed to show that the consequences of the continued enforcement of the judgment in his criminal proceeding would be "against conscience" or "contrary to justice," warranting equitable relief in the nature of *audita querela* because of "*Booker* error" alone.  Nothing about the historical nature of the writ suggests that Villafranco should be excused from serving his existing sentence.

To the contrary, even under *Booker*'s more flexible "advisory" Guidelines system, Villafranco's sentence would have been determined in essentially the same way as it was in May of 2004.  Moreover, an identical sentence under *Booker*'s "advisory" Guidelines sentencing scheme would be presumed to be reasonable and would not exceed any statutory maximum penalty based upon his guilty plea to his offense of conviction under 18 U.S.C. §922(g)(1).

A criminal sentence that the court of appeals would find presumptively reasonable likely will not "shock the conscience" of that tribunal sufficiently for it to sustain the granting by this court of an extraordinary writ to redress "*Booker* error" in the context of this case.

Villafranco has not demonstrated that his case is among those "most extreme cases" warranting the *audita querela* remedy "to avoid a punishment grossly disproportionate to the offense." *Ejelonu*, 355 F.3d at 551, 552.

Absent such a showing, his petition for a writ of *audita querela* must be denied.

**CONCLUSION**

This court has addressed the law governing Villafranco's writ petition at some length, and has done so in light of the law as it has evolved since *Booker* was decided fifteen months ago and since Villafranco filed his writ petition last May.  In the interim, at least one important threshold question, *viz.*, the retroactivity of *Booker*, has been answered by the court of appeals.

This court has undertaken to sort out in specific detail the nature and requisites of the writ of *audita querela*, its relationship to 28 U.S.C. § 2255 and other federal post-conviction remedies, and in particular, its availability as a remedy for "constitutional *Booker* error" once it has been decided that the general "law-at-the-time" non-retroactivity principles of *Teague v. Lane* apply, rather than its two very narrow exceptions.

Congress' enactment of the Sentencing Reform Act of 1984,[60] which drastically limited a district court's power to correct a criminal sentence after the fact,[61] and the so-called Antiterrorism

---

[60]Act of October 12, 1984, Pub. L. No. 98-473, Title II, 98 Stat. 1987, *codified as amended at* 18 U.S.C. §§ 3551 *et seq.* (2000).

[61]Among other things, the 1984 Act rewrote Rule 35 of the Federal Rules of Criminal Procedure, and all but eliminated the sentencing court's power to correct or reduce a sentence (other than on motion by the Government based

(continued...)

and Effective Death Penalty Act of 1996,[62] with its more stringent limits on the filing of motions

to vacate, set aside or correct a sentence pursuant to 28 U.S.C. § 2255,[63] has sent more than a few

federal prisoners scurrying into the law library in search of alternate procedural avenues of

collateral attack on their convictions and sentences.[64]  These erstwhile students of the law have

been booking up on Seventeenth-Century English equity practice and dusting off old common-law

writs[65]—all in the hope of being heard on genuine questions as to their own sentences in light of

*Booker*'s reading of the Sixth Amendment.  Their efforts are grounded upon the commonsense

notion that "once a new rule is applied to the defendant in the case announcing the rule,

evenhanded justice requires that it be applied retroactively to all who are similarly situated."

---

[61](...continued)
upon a defendant's "substantial assistance").  *See* Pub. L. No. 98-473, Title II, § 215(b), 98 Stat. 2015; *compare* Fed. R. Crim. P. 35 (repealed 1987) *with* Fed. R. Crim. P. 35 (amended 2004).  The current Rule 35 could almost be read to portend a return to Sixteenth-Century jurisprudence, when "a trial court was not authorized to correct its own errors"—and writs such as *coram nobis* were *created* to provide a suitable equitable remedy and avoid manifest injustice in particular cases.  LaFave & Israel, *supra*, § 28.1, at 1179.

   These days, it seems, Rule trumps Writ.  *E.g.*, *Carlisle v. United States*, 517 U.S. 416, 428-29 (1996).  But we should not lose sight of the "essentially equitable" nature of Writs such as *audita querela* in calling upon courts to mete out justice in those particular cases where Rules provide an inadequate remedy, or no remedy at all.

[62]Act of April 24, 1996, Pub. L. No. 104-132, §§ 101-107, 110 Stat. 1214.

[63]*See, e.g.*, Randal S. Jeffrey, *Successive Habeas Corpus Petitions and Section 2255 Motions after the Antiterrorism and Effective Death Penalty Act of 1996: Emerging Procedural and Substantive Issues*, 84 Marq. L. Rev. 43 (2000).

[64]*See, e.g.*, Peter Hack, *The Roads Less Traveled: Post Conviction Relief Alternatives and The Antiterrorism And Effective Death Penalty Act of 1996*, 30 Am. J. Crim. L. 171 (2003).

[65]Writs such as *audita querela* originated in the English Court of Chancery as an alternative to the sometimes harsh and often intractable Rules of the common law, and granted relief according to principles "which were based on what was fair in a particular situation." *Black's Law Dictionary* 540 (6th ed. 1990). "Principles of equity, we were all taught, were introduced by Lord Chancellors and their deputies . . . . in order to provide relief from the inflexibility of common  law rules."  *Medforth v. Blake*, [1999] 3 All E.R. 97, 110 (C. A.).  The writ of *audita querela* "'is of a most remedial nature,'" and appears "'to have been invented, lest in any case there would be an oppressive defect of justice, where the party has a good defence, but had not, nor has any other means to take advantage of it.'"  *Humphreys*, 50 U.S. (9 How.) at 313 (quoting 3 William Blackstone, *Commentaries* *405); *Turner v. Davies*, 2 Wms. Saund. 137, 85 Eng. Rep. 871, 878-79 n.(1) (K.B. 1670) (Reporter's Note); (*see Supposed Doctrine of Lord Hardwicke and Lord Eldon*, C.P. Cooper 507, 638, 47 Eng. Rep. (Appx.) 624, 693 (1839) (finding that "'[when a petitioner] hath good matter to plead, but hath had no opportunity of pleading it . . . , an *audita querela* lies in the nature of a bill in equity, to be relieved against the oppression of the Plaintiff.'" (quoting 3 William Blackstone, *Commentaries* *406).).

*Teague*, 489 U.S. at 300 (O'Connor, J., joined by Rehnquist, C. J., Scalia and Kennedy, JJ.).

But that is not the law as it stands today.

Considerations of finality now prevail over concern for evenhandedness,[66] and under the "law-at-the-time" principle of *Teague v. Lane*, those defendants whose convictions and sentences had become final before January 12, 2005 (or for that matter, before June 24, 2004[67]), may not avail themselves of the remedy crafted in *Booker*—advisory Guidelines sentencing—for the Sixth Amendment deficiencies that *Booker* identified in the mandatory Guidelines system, unless and until the Supreme Court explicitly rules otherwise.[68]

Because Villafranco has failed to establish a sufficient legal or equitable basis for issuance of the writ,

---

[66]*See, e.g.*, *Daniels v. United States*, 254 F.3d 1180, 1193-94 (10th Cir. 2001) (explaining that "the rule against retroactive application . . . supports important interests of finality" of federal criminal convictions).  Writing for the Court in *United States v. Addonizio*, 442 U.S. 178 (1979), a case that Villafranco cites and relies upon in his petition, Justice Stevens explained that "[t]he reasons for narrowly limiting the grounds for collateral attack on final judgments are well known and basic to our adversary system of justice."

> Inroads on the concept of finality tend to undermine confidence in the integrity of our procedures. . . . Moreover, increased volume of judicial work associated with the processing of collateral attacks inevitably impairs and delays the orderly administration of justice.  Because there is no limit on the time when a collateral attack may be made, evidentiary hearings are often inconclusive and retrials may be impossible if the attack is successful. . . .

442 U.S. at 184 & n.11 (citations omitted).  Times have changed.  *Cf.* Note, *The Supreme Court, 1962 Term*, 77 Harv. L. Rev. 140 (1963) ("A single theme dominates the Court's effort . . . to fashion the scope and nature of federal postconviction remedies: the interest in achieving finality in criminal proceedings is to be valued less highly than the interest in assuring that no individual is deprived of life or liberty in violation of the Constitution." (footnote omitted)).

[67]*United States v. Price*, 400 F.3d 844, 849 (10th Cir. 2005) (holding *Blakely* does not apply retroactively to convictions that were final when that case was decided on June 24, 2004).

[68]*Cf. Howard v. United States*, 374 F.3d 1068, 1073-81 (11th Cir. 2004) (holding that the Supreme Court's ruling in *Alabama v. Shelton*, 535 U.S. 654 (2002) applies retroactively to cases on collateral review under § 2255); Note, *Rethinking Retroactivity*, 118 Harv. L. Rev. 1642 (2005) (arguing that new rules of constitutional criminal procedure implicating the accuracy of criminal proceedings, *e.g.*, *Apprendi*, should apply retroactively).

**IT IS ORDERED** that Villafranco's "Petition for a Writ of Audita Querela," filed May

10, 2005 (dkt. no. 2), is hereby DENIED.

DATED this *17th* day of April, 2006.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge

-57-